MORGANTI NATIONAL, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 97–744C.

United States Court of Federal Claims.

April 4, 2001.

112

Robert G. Watt, McLean, VA, for plaintiff. Carter B. Reid, Bennett J. Lee, and Scott W. Kowalski, of counsel.

Steven J. Gillingham, U.S. Department of Justice, Washington, DC, with whom were Assistant Attorney General David W. Ogden, and Director David M. Cohen, for defendant. Thomas D. Dinackus and Gerald M. Alexander, U.S. Department of Justice, and Michael A. Lewis, Federal Bureau of Prisons, of counsel.

**OPINION**

FIRESTONE, Judge.

**I. INTRODUCTION**

The present action was brought pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–603 (2000). Plaintiff-contractor Morganti National, Inc. ("Morganti") was default terminated for failure to make progress in constructing the 1,000 Bed Federal Detention Center in Brooklyn, New York. In this action, Morganti seeks to convert the termination for default into a termination for the convenience of the government on the grounds that the defendant excusably delayed its performance and materially breached the contract. Defendant Federal Bureau

of Prisons ("FBOP") argues that the termination for default was justified and therefore should be upheld. The court held a three-and-a-half-week trial from August 7 through August 31, 2000. The court heard testimony from more than 25 witnesses. In addition, the parties presented in excess of 400 exhibits to the court. Based on the evidence presented, for the reasons that follow, the court concludes that the FBOP's termination for default is justified and therefore must be upheld.

**II. BACKGROUND FACTS**

**A. Contract and Modifications**

On or about June 21, 1993, the FBOP solicited bids for the construction of the 1,000 Bed Federal Detention Center in Brooklyn, New York ("project"). Plaintiff Morganti of Danbury, Connecticut and Trataros Construction, Inc. of Brooklyn, New York (jointly "MTJV") submitted a bid and offer to construct the project for a fixed price of $103,444,000.[1] On September 28, 1993, the FBOP accepted the MTJV bid as the lowest responsible and responsive bid of the nine bids that were submitted, and awarded MTJV Contract No. JX00c–140 in the amount of $103,444,000.

In general, the project called for the construction of a 14–story building that houses the new 1,000 Bed Federal Detention Center. The nine-floor superstructure of the building is constructed of cast-in-place concrete. In addition, portions of the exterior of the 4th through 8th floors have precast concrete panels. Each of floors 4 through 8 has a mezzanine level (hereinafter "M"), giving the building its 14–story height. Floors 1 through 3 serve as prison administrative areas, while floors 4 through 9 house the 1,006 inmate detention cells. The detention cells utilize a metal partition design that incorporates the use of prefabricated metal cell panels and security windows in each cell. The detention areas on floors 4 through 8M are divided into three cell blocks, designated "A" for North, "B" for South, and "C" for East. In addi-

1. Morganti and Trataros Construction, Inc. intended to perform the contract as a joint venture—the Morganti/Trataros Joint Venture. Ultimately, Trataros left the joint venture in November 1995, and Morganti assumed the contract by a novation agreement. The FBOP approved the dissolution of the joint venture on April 2, 1996, in Modification No. 261.

tion, each cell in a cell block is also designated with a number and the letter "N" for North, "S" for South, or "E" for East. The 9th floor is different from floors 4 through 8M in that it has only two wings, North and South. In addition, the detention cells on the 9th floor are designated as higher-security segregation units, with a shower in each cell. There are also an indoor recreation room, an outdoor recreation area, and a food alcove in each of the two wings on the 9th floor.[2]

In addition to the specific contract terms relating to the project, the contract contained a number of standard contract provisions contained in the Federal Acquisition Regulation ("F.A.R."), including the following: 52.234–4 "Changes"; 52.233–1 "Disputes"; 52.232–5 "Payments Under Fixed–Price Contracts"; 52.236–15 "Schedules of Construction Contracts"; and 52.249–10 "Default (Fixed Price Construction)."

Separate from its contract with Morganti, the FBOP also contracted with Urbahn Associates, Inc. ("Urbahn") to be the architect for the project. Urbahn prepared the design, plans, and specifications for the project, including the designs and specifications for all contract modifications. In addition, the FBOP contracted with CRSS Constructors, Inc. ("CRSS") as the construction management firm for the project. CRSS furnished management services, including scheduling analysis and estimating services for the FBOP, throughout Morganti's performance on the project.

On December 1, 1993, the FBOP issued the Notice to Proceed to Morganti. The original contract schedule provided a contract performance period of 730 days, with a substantial completion date of November 30, 1995, and a final completion date of February 1, 1996. Pursuant to the contract, Morganti was required to prepare a schedule and submit updates using critical path method or "CPM" scheduling.

The FBOP accepted Morganti's baseline schedule on June 24, 1994, and Morganti issued its final detailed baseline schedule on or about August 1, 1994. This schedule and its updates became known as "Schedule A." As required under the contract, Schedule A was fairly complex and required the scheduling and tracking of more than 7,000 activities. In addition, Morganti was required to submit a schedule of values that correlated to the various activities listed in the contract schedule. Under the contract, Morganti's progress would be tracked against the contract schedule in monthly schedule updates submitted to the FBOP, and Morganti would be paid in accordance with the schedule of values upon its submission of proper payment requisitions.

As initially contemplated under Schedule A, Morganti was to complete the concrete exterior by December 1994. By March 31, 1995, Morganti was to have completed the exterior precast panels, the windows, and the interior cell panels. By late October 1995, Morganti was to have completed the following interior work: interior partitions and ceilings; hollow-metal frames and doors; mechanical, electrical, and plumbing equipment, piping, conduits, wiring, start-up, and testing (known collectively as "mechanical, electrical, and plumbing" or "MEP" work); elevators; building security, inmate duress, fire/life safety, power, lighting, water supply, and wastewater systems; and building site work. In order to meet the requirements of Schedule A, Morganti anticipated that a peak workforce of up to 350 workers would be needed.

Under the contract Morganti was primarily responsible for project administration, project scheduling, coordination of subcontractors, quality control, and field engineering. The FBOP waived the requirement that 20 percent of the work be done by Morganti as prime contractor. Morganti's subcontractors included Julius A. Nasso Concrete ("Nasso") for the cast-in-place concrete, Applegarth Industries for the precast panels, Maris Equipment Co., Inc. ("Maris") for fabrication and installation of metal cell panels and related work, Levinson & Santoro Electrical Co. for electrical work, Petri Mechanical Co. for plumbing, Navillus Tile Corp. for masonry,

---

**2.** The court conducted a site visit of the 1,000 Bed Federal Detention Center on January 5, 2000.

and Dart Mechanical Co. for heating, ventilation and air conditioning. The work of these seven subcontractors plus Morganti's general conditions work accounted for approximately 80 percent of the original contract value.

During the course of Morganti's performance, the FBOP was forced to make numerous contract changes. Prior to termination, the FBOP issued 359 contract modifications, or "mods," some of which affected the contract price and the performance period. Ultimately, through these modifications the contract price was increased from $103 million to $110 million. The FBOP also granted Morganti 176 calendar days (167 compensable calendar days) in time extensions through Modification Nos. 056, 057, 103, 104, and 108, for events experienced in the first eleven months of the project, including winter weather delays, test-pile program delays, differing site conditions, and design changes to the piles and the pile caps. As a result of a differing site condition and subsequent winter weather delays, the concrete superstructure was not substantially completed or "topped out" until April 1995.

Later in the project, in August 1996, the FBOP granted Morganti a 190–calendar–day non-compensable time extension to December 31, 1996, for additional problems. This extension was granted in Modification Nos. 319, 326, 328, and 331. The bulk of the extension came under Mod 331, which was executed by the parties on August 6, 1996. In addition to the non-compensable time extension, Mod 331 granted Morganti an equitable adjustment in the amount of $625,000.

Although Mod 331 extended the contract completion date to December 31, 1996, the parties recognized that Morganti might still be entitled to additional time for events that the parties could not resolve. In particular, Mod 331 left unsettled several contractor proposed changes ("CPC's") and unilateral modifications. In this connection, Mod 331 provides:

this modification covers all issues, known and unknown, that occurred between April

1, 1995 and December 31, 1995 for time and money with the following exceptions:

1) ... CPC's previously submitted [by Morganti] for impacts during the period April 1, 1995 through December 31, 1995.

2) Undefinitized Unilateral Modifications issued [by the FBOP to Morganti] during the period April 1, 1995 through December 31, 1995 [including Modification No. 192, issued July 27, 1995].

3) Action Files Numbers (taken from Morganti's letters dated July 23, 1996 "Definitization of Direct/Indirect Cost" and "Action File Listing April 1, 1995 through December 31, 1995"): [relating to Morganti Action Files Nos. 208, 222, 303, 330, 334, 367, 402, 487, 538, 552, and 568].... 

4) Maris costs incurred during April 1, 1995 through December 31, 1995; Both parties agree that Maris is also bound by Morganti/FBOP agreement reached of 190 noncompensable days. Morganti and the FBOP agreed during negotiations August 1, 1996 that Action File No. 496, Storage Cost of Fuel Oil Tanks—Dart, identified in Morganti's letter dated July 23, 1996 is not a Maris issue and shall be included with the agreement reached August 1, 1996.[3]

Among the reasons Morganti and the FBOP were unable to compute possible delays for the items identified in Mod 331 was that Schedule A had become hopelessly out of date. By virtue of the numerous modifications and time extensions to the project, Morganti was unable to keep up with the required schedule updates. The contract did not allow Morganti to add time to the contract schedule until the time was approved by the FBOP via bilateral modification. As a result, neither Morganti nor the FBOP was able to keep up with all of the changes. Phyllis McBride and Elizabeth Moore, successive contracting officers on the project, as well as Asraf Basta, from CRSS, testified to the problems with Morganti's schedules at trial. Eventually, in an effort to address

3. On May 3, 1996, Maris, Morganti's primary subcontractor responsible for detention work, left the project. The impact of Maris's departure is discussed below.

these scheduling issues, Morganti brought in a scheduling expert, Wagner, Hohns, Inglis, Inc. ("WHI"), to produce a new project schedule. Starting in July 1995, Morganti and WHI began preparing a new "Work to Complete Schedule," which eventually became known as "Schedule B."

Schedule B was not complete at the time the parties negotiated Mod 331. As a result, the parties were not equipped to make requests or evaluate time extensions for the events left unresolved by the exceptions to Mod 331. Of critical importance to this case, Mod 331 left open the possibility that Morganti would be entitled to a further extension of time due to the impact of unilateral Modification No. 192 on the project. Mod 192 made design changes to 31 corner cells in order to bring the original contract specifications into conformance with FBOP guidance implementing the Americans with Disabilities Act ("ADA"). At trial, Morganti presented testimony to support its claim for a 511–calendar–day contract extension because of the additional work arising from Mod 192.

**B. The Schedule B Agreement**

Between December 1995 and July 1996, the FBOP and Morganti had several meetings regarding the FBOP's acceptance of Morganti's "Work to Complete—Schedule B." Based on these discussions, on August 9, 1996, the FBOP and Morganti executed a bilateral agreement entitled "Conditions of Recognition of [Morganti] Work to Complete—Schedule B" ("Schedule B Agreement").

According to the terms of the Schedule B Agreement, the parties recognized February 22, 1996, as "the cut-off date for evaluating any events, impacts, planned dates, and progress for work to complete under the accepted Contract Schedule (Schedule A)." As stated in the agreement, the parties agreed that "[Morganti] Work to Complete Schedule B shall be used for assessing the Contractor's progress, as well as any impacts after February 22, 1996, in accordance with the Contract Completion Date (Schedule A)."

In this connection, the parties further agreed that the activity durations and schedule logic in Morganti's WC04 Schedule B

update ("WC04"), which set September 22, 1997 as the substantial completion date for the project, would serve as the baseline schedule for measuring any impacts to the schedule. Thus, the agreement provides as follows:

Actualized dates and activities defined within [Morganti] Work to Complete Schedule B, Update WC04, Data Date May 31, 1996 shall be the actualized dates for all respective activities in any preceding [Morganti] Work to Complete Schedule B updates. *Any new activities/logic reflected in WC04 shall apply to all previous Work to Complete Schedule updates.*

(Emphasis added).

Finally, the Schedule B Agreement set forth how future time extensions, if any, would be evaluated and inputted into the contract:

All future impacts, from February 22, 1996 until project completion, shall be evaluated on the basis of the Work to Complete Schedule WC01. Any future extensions of time, shall be inputted into the accepted Contract Schedule (Schedule A).

Under Morganti's original Schedule B—WC01, Morganti had projected a substantial completion date of January 15, 1997, which was essentially the same as the December 31, 1996 contract completion date in Schedule A. Thus, the parties agreed that Morganti's Schedule B—WC01 was theoretically equal to Schedule A, even though the completion dates were not exactly the same.

Various witnesses testified about the intended effect of the Schedule B Agreement. Phyllis McBride, the FBOP's contracting officer on the project who negotiated Mod 331 and the Schedule B Agreement, testified that she agreed to recognize Schedule B because she realized that Morganti was likely entitled to some additional time for Mod 192, but was unable to determine then just how much time it was due. Ms. McBride explained her understanding of the agreement as follows:

THE COURT: ... And those open CPC's and undefinitized mods [identified in Mod 331], how did that play into your view of the September '97 date?

THE WITNESS: Well, [I'll go] back again to whether or not Morganti would be able to substantiate that there was any time due for that. That's why we recognized Schedule B. If there was an actual time for a particular mod. or for a particular CPC, then they were to take that particular element and incorporate it within the Schedule B or the time frame. And we, in turn, would then take that and apply it on Schedule A. So it would still match if you look at the overall picture. It would still match together. But you had to take whatever favorite playing hand for those particular mods and CPC's and apply it back on Schedule A itself. And that would give them the time extension that they would need. So, maybe, eventually the payment on how much they could substantiate, it would eventually pay out to that September 1997 date.

In Ms. McBride's view, any extension of time based on impacts would be added to the December 31, 1996 contract completion date, not to the September 22, 1997 date set in WC04.

Steven Chin, the FBOP's project manager, was also present at the Schedule B Agreement negotiations. Mr. Chin testified that the purpose of the agreement was to allow Morganti to continue working past the December 31, 1996 contract completion date if Morganti could give the FBOP a date certain by which it would complete the project. Mr. Chin testified that "[f]rom my standpoint, all the bureau was looking for was for the contractor to give us a date that they—that obligated them." Mr. Chin further explained how the parties agreed to evaluate future time extensions under the agreement as follows:

THE COURT: ... And did you negotiate any time for those excluded items? If they were excluded [from Mod 331], that meant that they weren't on the table?

THE WITNESS: I believe it was incorporated into Schedule B. It was mostly cost issues that could have possibly had time and it was excluded, yes, it could possibly have an impact on Schedule B in terms of the duration. But if they were due any more time, it would have been a sign the see [sic] the December date—I mean, the contract date....

THE COURT: And your thought was if more time would be due and owing on the open mods, you'd add it to when?

THE WITNESS: More time, if they were due a compensable delay on any of the open mods, it would be added. That delta would have been added to the contract completion date under Schedule A.

On November 20, 1996, after the Schedule B Agreement was negotiated, the FBOP changed contracting officers and named Elizabeth Moore as the new contracting officer. It was Ms. Moore who ultimately terminated Morganti for default. Ms. Moore also testified as to her understanding of the Schedule B agreement. Ms. Moore explained that she understood that under the Schedule B Agreement, the FBOP had agreed to forbear from enforcing the contractual substantial completion date of December 31, 1996 for as long as Morganti was making acceptable progress toward substantial completion by the September 22, 1997 date identified in WC04. According to her understanding, in executing the Schedule B Agreement the FBOP would allow Morganti to continue working toward completion of the project "in lieu of termination" under F.A.R. 49.402–4, as long as Morganti maintained progress that would ensure a September 22, 1997 substantial completion date. Ms. Moore further testified that with respect to events after the Schedule B cut-off date, February 22, 1996, "if the government caused the delay, I would have changed—by modification, I would have changed the contract completion date of December 31 for an additional 30 days. I also would have recognized and not held Morganti to September 22. I would say, you know, okay and tell everybody they're not going to be finished now until October 22."

Morganti presented the testimony of Theodore Catino, Morganti's vice president in charge of the project, who negotiated the agreement with Ms. McBride. Mr. Catino testified that he understood that extensions of time would be added to the September 22, 1997 date in WC04. However, he did not dispute that in a series of subsequent bilateral modifications signed by Morganti, it was

clear that the parties intended that any time extensions would be added to the December 31, 1996 contract completion date—not to the September 22, 1997 date that Morganti had projected for substantial completion in WC04. In fact, in its November 6, 1996 time request for Mod 192, Morganti sought an extension of time from the December 31, 1996 contract completion date. In none of the contemporaneous documents did the parties suggest that time extensions would be added to WC04's September 22, 1997 substantial completion date.

## C. The Termination Decision

Starting in the fall of 1996, it became apparent that the substantial completion date of September 22, 1997 that Morganti projected in WC04 was slipping. Ms. Moore testified that after she became the contracting officer in the fall of 1996, she became concerned that Morganti was not making sufficient progress toward the December 31, 1996 contract completion date or the September 22, 1997 Schedule B substantial completion date. Specifically, Ms. Moore felt that Morganti was failing to properly supervise and coordinate the project work, had insufficient manpower on the project, and was not progressing the project work. As a result of these concerns, Ms. Moore issued a cure notice to Morganti on January 10, 1997. The cure notice stated in relevant part:

[T]he Government considers your failure to complete the above-referenced project by the scheduled contract completion date of December 31, 1996, or to comply with your revised Schedule to Complete (Schedule B), a condition endangering performance of the contract....

The scheduled contract completion date was December 31, 1996. As of November 30, 1996 Data Date, only 73.39% of the work was completed.

... during the period from August 1, 1996, through November 30, 1996, [Morganti] has continued to demonstrate a lack of diligence by completing only a monthly average of .83% of the work remaining.... At [Morganti's] current pace of work, it is anticipated that the project will not be completed for another 32 months. Not-

withstanding this projection, [Morganti] continues to fall behind on their own schedule for work (Schedule B), as its latest schedule update shows a completion date for November 1997.

Our observations of [Morganti's] past and current manpower, [Morganti's] failure to correct deficient contract work in a timely fashion to mitigate impacts to the Schedule (e.g. concrete, hollow metal/cell doors/cell panels, Div. 16 impacts on Div. 17 work, installation of permanent power, chillers, etc.), and [Morganti's] unwillingness to accurately assess and mitigate the impacts on the Schedule leaves the Government justifiably insecure that substantial completion will be attained by any certain time frame.

Morganti submitted two interim responses and a final response to Ms. Moore's January 10, 1997 cure notice. In his January 24, 1997 interim response on behalf of Morganti, Mr. Catino disputed the FBOP's charges regarding Morganti's lack of progress. He argued that FBOP-caused delay was to blame for Morganti's lack of progress. According to Mr. Catino: "Measurement of progress against a construction schedule that is not being followed will necessarily yield a false—and, in this case, erroneously low—rate of progress.... [T]he delays through December 31, 1996 have been excused (on either a compensable or non-compensable basis), and the progress before and since that date is not accurately reflected in your letter.... [B]arring any other [FBOP]-caused delays, [Morganti] can and will achieve substantial completion in accordance with Schedule B [September 22, 1997 completion date]...."

However, Mr. Catino's contention that Morganti could meet the September 1997 substantial completion date was contradicted by the actual events occurring on the project site. A November 13, 1997 internal memorandum from Morganti's project manager, John Rhodes, indicated that in order to meet a late October 1997 substantial completion date, Morganti needed to erect all of the cell panels for floors 4 through 8M, including

both Mod 192 and "typical" cell panels,[4] by February 19, 1997, and all of the 9th floor cell panels by March 12, 1997. In fact, as discussed below, the fabrication and delivery of both the Mod 192 and typical cell panels were delayed throughout the remainder of the project, which in turn caused Morganti to fall behind Mr. Rhodes's schedule for cell-panel installation.

Again, in his February 7, 1997 final response to the cure notice, Mr. Catino reiterated his belief that "the FBOP must bear substantial responsibility for the delays encountered thus far," yet emphasized that "Schedule B projects a substantial completion date of September 1997, and Morganti is committed to take every action and devote all necessary resources to meet that date." Among the actions Morganti identified that it was taking in response to the cure notice were: a projected increase of manpower by March 7, 1997; an increase in management/administrative staffing; completion of cell-panel installation by June 9, 1997; and contracting with a third subcontractor, Maximum Security Products, to expedite assembly of Mod 192 cell panels. Finally, Mr. Catino requested "prompt processing and payments of the pending CPC's, modifications, and requisitions for stored material and equipment, the total unpaid value of which is now in excess of *$30 million*."

Ms. Moore testified that she fully considered Morganti's responses to the cure notice, but found them lacking. Ms. Moore did not agree with Morganti's calculation of its rate of progress and was unimpressed with Morganti's progress in correcting work identified in outstanding deficiency and omission reports. In addition, Ms. Moore was dissatisfied with Morganti's progress in procuring and installing security windows and cell panels, and found that Morganti's representations in this regard were incomplete or misleading. In sum, despite Morganti's claims, Ms. Moore stated that she did not believe that Morganti was putting forth its best efforts to cure the deficiencies she described in the cure notice.

Shortly after receiving Morganti's final response to the cure notice, Ms. Moore advised Morganti in writing that she continued to be concerned about its progress with respect to, among other things, the cell panels and the security windows. Ms. Moore requested detailed scheduling information that would provide the FBOP with a fuller understanding of Morganti's plan to achieve timely completion. However, Morganti was unable to timely provide the requested information, further exacerbating Ms. Moore's concerns about Morganti's commitment to the project and its ability to complete by September 1997. Eventually, Morganti supplied revised scheduling information to the FBOP, but Ms. Moore testified that the logic and duration of the activities in the revised schedule caused the FBOP to have serious reservations about the feasibility of those schedules.

Although Morganti's schedule updates during the winter of 1996 showed continued slippage, on January 31, 1997, Morganti provided the FBOP with a recovery schedule, WR10, in which Morganti attempted to show how it would achieve the September 22, 1997 substantial completion date. As with Morganti's previous schedule submissions, Ms. Moore concluded that WR10 was unrealistic and did not provide her with sufficient proof of Morganti's ability to meet the September 22, 1997 substantial completion date. This conclusion was confirmed when Morganti's subsequent schedules indicated a later substantial completion date.

Against this backdrop, Ms. Moore issued Morganti a show cause notice on March 25, 1997. Ms. Moore testified that she continued to be particularly concerned that the schedules Morganti submitted after it received the cure notice were neither reasonable nor attainable, and that as a result, the FBOP was uncertain as to whether Morganti could achieve timely completion. Ms. Moore also testified that Morganti's manpower subsequent to the cure notice failed to meet Morganti's projections, and that Morganti again

---

4. As discussed in more detail below, in addition to fabrication and installation of Mod 192 cell panels, Morganti was also responsible for fabrication and installation of cell panels for the non-ADA-designated cells. The cell panels for these non-ADA-designated cells shall hereinafter be referred to as "typical" cell panels.

had failed to make adequate progress on cell panels, security windows, hollow metal, and security electronics. Finally, Ms. Moore noted that Morganti's January and February 1997 schedule updates were already indicating that Morganti's progress had slipped 35 days from its recovery schedule.

Mr. Catino responded to the show cause notice on April 11, 1997, setting forth his explanation for why Morganti's progress failures were beyond the control and without the fault or negligence of Morganti. Mr. Catino admitted that the Schedule B completion date had slipped from September 22 to December 1997, but contended that the slippage was due to the fact that Schedule B did not reflect the impact of many mods issued by the FBOP, and that the FBOP had not yet accepted and approved Morganti's time request submitted for those changes. Mr. Catino further maintained that Ms. Moore's assessment of Morganti's progress, based on payment requisitions rather than the updated Schedule B, was inaccurate. Mr. Catino stated that contrary to Ms. Moore's assertions, Morganti was making sufficient progress in the areas of security windows, security electronics, chiller equipment, hollow metal, and cell-panel installation. In response to Ms. Moore's concerns regarding manpower, Mr. Catino stated that manpower levels were being affected by unresolved construction issues and nonpayment of additional monies sought by Morganti's subcontractors. In this connection, Mr. Catino complained that Morganti's progress was being impeded by the FBOP's failure to resolve several CPC's in which Morganti sought additional payment, including CPC 58 and CPC 53, and by the FBOP's practice of retaining and withholding monies from Morganti's progress payments.

Ms. Moore testified that she fully considered those responses. Again, Ms. Moore was unpersuaded by Morganti's explanation of its failure to make progress. Specifically, Ms. Moore testified that she was concerned that the substantial completion date in Morganti's recovery schedule updates had slipped to January 1998. In addition, Ms. Moore noted that Morganti still had failed to provide the FBOP with consistent and reliable scheduling information, despite the fact that Ms. Moore had repeatedly requested that information. Ms. Moore further concluded that Morganti had failed to make progress in the procurement and installation of security windows. Finally, Ms. Moore testified that she was concerned that Morganti was having difficulty financing its subcontractors, when she felt that the FBOP had paid Morganti all it was due at the time. At the time she was only holding 2 to 3 percent in retainage on what was, in her view, a failing project.

Based on these concerns, Ms. Moore next considered termination. Before deciding to terminate Morganti, however, Ms. Moore consulted extensively with FBOP and CRSS employees more familiar with Morganti's performance history. Ms. Moore testified that she considered separate analyses of Morganti's manpower performed by CRSS and Capital Project Management, Inc. ("CPMI"), an additional scheduling expert hired by the FBOP. Ms. Moore explained that CPMI and CRSS's findings that Morganti was providing insufficient manpower supported her own belief that Morganti's manpower was not adequate to ensure timely completion of the project. She also considered charts demonstrating Morganti's rate of progress prepared by Scott Higgins of the FBOP, which showed that at Morganti's then-current rate of progress of approximately 1 percent per month, Morganti would not complete the project until January 1999. Mr. Higgins's charts also depicted his analysis of the time it would take to complete the project in the event Morganti was terminated and the FBOP reprocured the work. Based on his analysis, Mr. Higgins concluded that a reprocurement contractor could complete the work by December 30, 1998—earlier than Morganti could complete the work.

Ms. Moore also considered Morganti's November 6, 1996 request for a time extension due to Mod 192. Morganti had submitted a request for a 213–work–day time extension that would extend the contract completion date until October 30, 1997. Ms. Moore hired CPMI, which later became the FBOP's trial expert, to perform an independent analysis of the time request. CPMI determined

that Morganti was not entitled to any time extension for Mod 192. CPMI found that the time request failed to take into account Morganti's own delays, such as its slow progress in procuring and installing the typical cell panels and other problems relating to alignment of concrete, cell panels, and security windows. Although Ms. Moore initially testified that she had reviewed the CPMI report or an earlier draft before terminating Morganti, she later clarified that she was only verbally briefed on CPMI's findings before making her decision. Ms. Moore testified that she relied on this verbal briefing of CPMI's findings, in addition to the advice from her technical support staff and CRSS, to deny Morganti's request for the time extension requested for Mod 192.

On April 30, 1997, having concluded that Morganti could not meet the September 22, 1997 substantial completion date recognized in WC04, Ms. Moore sent Morganti a notice terminating the contract for default. In her termination for default notice, Ms. Moore set forth the reasons for her decision. The termination notice explained that Morganti had completed only approximately 75–76 percent of the contract work, while approximately 110 percent of the contract period had lapsed. The termination notice stated as follows:

> [Morganti's] February 7, 1997 response to the Cure Notice states, "Schedule B projects a substantial completion date of September 1997, and Morganti is committed to take every action and devote all necessary resources to meet that date and is confident it can and will do precisely that ..." Yet, just two months later, in its April 11, 1997 response to a Show Cause Notice issued on March 25, 1997, [Morganti] readily admits in its projections it cannot substantially complete the project until at least December of 1997. That date is one year after the contractually approved completion date, and [Morganti] has failed to justify, in accordance with the Federal Acquisition Regulation, any alleged delays by the Government attributing to [Morganti's] December 1997 projected completion date.

Accordingly, Ms. Moore concluded that the FBOP was "justifiably insecure that the project will be completed in a timely manner, and in accordance with the contract specifications."

### D. Work Remaining After Termination

There is no dispute that as of the termination in April 1997, Morganti could not meet the September 22, 1997 substantial completion date identified in WC04. As noted above, Ms. Moore's evaluation of Mr. Higgins's analysis of Morganti's as-built progress at the time of termination revealed that Morganti had completed only 75–76 percent of the contract work and that at Morganti's then-current pace of work—approximately 1 percent per month—it would not complete the project until January 1999.

At trial, the FBOP also presented testimony by its scheduling expert, Frank Brennan, Executive Vice President of CPMI. Mr. Brennan testified that he evaluated three different work-to-complete scenarios. In this connection, Mr. Brennan testified that based on its WR14 April 1, 1997 schedule update, Morganti predicted a November 17, 1997 completion date. However, Mr. Brennan noted that he did not believe this to be a realistic completion date, given that Morganti was behind schedule in procuring the remaining cell panels, security window deliveries were delayed due to fabrication errors, and manpower levels were below those needed to complete the scheduled work. Mr. Brennan also testified that CRSS prepared a schedule to complete that estimated that 12.5 months of work remained to project completion, or until May 1998. Finally, Mr. Brennan summarized the projected completion schedule prepared by Lehrer McGovern Bovis ("LMB"), the completion contractor hired by Morganti's surety. Upon taking over the contract, LMB's schedule projected that 16.75 months of work remained to be completed. Mr. Brennan testified that he relied on the LMB schedule durations for his analysis. Based on LMB's schedule, Mr. Brennan estimated that had Morganti continued working at its pre-termination rate of progress, it would not have completed the remaining work on the project until September 23, 1998.

Morganti presented the testimony of its scheduling expert, Frank McDonough, Chief Executive Officer of the construction engineering firm McDonough, Boylard & Peck ("MBP"). Mr. McDonough testified that Morganti would have been able to achieve substantial completion by May 1998, or perhaps a few months earlier. As discussed later, Mr. McDonough further testified that Morganti was entitled to a time extension from the FBOP for all of that time. Morganti's financial expert, Jeffrey Fuchs, also testified that Morganti would have needed about a year from April 1997 to complete the work remaining, and thus would not have achieved substantial completion until approximately April 1998.

## III. FACTS RELATING TO MODIFICATION 192

### A. Introduction—The Scope of the Impact

The impact of Mod 192 on Morganti's ability to complete the project is at the heart of this case. The FBOP issued Mod 192 on July 27, 1995, just as Morganti was preparing to commence cell-panel installation. Pursuant to Mod 192, Morganti was required to change 31 corner cells to conform to the FBOP's guidance implementing the ADA. As a result of Mod 192, Morganti had to redesign 387 cell panels of the 5,800 cell panels required for the project. Due to the resulting impact that these changes had on Morganti's cell-panel production, Mod 192 also required that Morganti resequence installation of cell panels and MEP follow-on work.

At the time Mod 192 was issued, the parties had varying views as to the resulting impact to the project schedule. When first presented with Mod 192, Maris, Morganti's detention subcontractor, told various FBOP employees that Mod 192 changes should not result in time impacts to the schedule. The FBOP's own scheduling contractor, CRSS, gave a "preliminary estimate ... of four to six weeks impact on the schedule." However, Steven Chin, the FBOP's project manager maintained that Morganti would suffer no time impact as a result of Mod 192. Shortly after Mod 192 was issued, Morganti asserted that Mod 192 would require significant resequencing of work and that this resequencing would result in a loss of productivity and comeback work. As noted, Morganti's trial expert, Mr. McDonough, testified that Mod 192 caused a 511–calendar–day excusable delay.

While the primary effects of Mod 192 itself related to the design, fabrication, and installation of the prefabricated metal cell panels that formed the walls of the 31 corner ADA-designated cells, the full impact extended beyond those cells to other cells. More specifically, in order to load the Mod 192 cell panels into the building, Morganti was unable to install a number of cell panels and exterior precast concrete panels on each floor until after all of the cell panels for that floor, including Mod 192 cell panels, were delivered onto the floor. These cells are referred to as "leave-out" cells or areas. Without all of the cell panels in place, Morganti could not complete the mechanical, electrical, and plumbing work for any floor or cell block.

At trial, the FBOP challenged Morganti's election to use "leave-out" areas to load cell panels into the building. Mr. Brennan testified that other Morganti-caused problems led to the decision to use leave-out areas. In particular, Mr. Brennan testified that Morganti had changed its "loading approach" to accommodate its concrete and masonry subcontractors, and not because of Mod 192. Morganti countered with the testimony of several witnesses who stated that the only feasible way to load the cell panels into the building was via the "leave-out" areas.

### B. Mod 192 Cell-panel Coordination and Fabrication

It is undisputed that before Morganti could proceed with fabrication of Mod 192 cell panels, Morganti had to coordinate the various affected trades and prepare "shop drawings" that showed the sizes and locations of the penetrations in the cell panels that were necessary to accommodate mechanical, electrical, and plumbing services. For example, the Mod 192 changes altered the utility openings in the chase walls and the height and location of grab bars, chair carriers, and mirrors.

Bill Sabino, Morganti's project engineer, was responsible for overseeing the coordination of Mod 192. Mr. Sabino testified that in addition to relocating MEP penetrations, the project superintendents also had to determine the sequence in which the MEP work would be installed. The evidence adduced at trial shows that Morganti forwarded coordination drawings to Maris, Morganti's detention subcontractor, on February 23, 1996. Maris had subcontracted with Industrial Acoustics Company ("IAC") to fabricate the metal cell panels required for the project. Once IAC had the coordination drawings, it was to begin preparing shop drawings that would be used to fabricate the Mod 192 cell panels.

As the coordination and preparation of shop drawings progressed, Morganti and the FBOP engaged in a series of exchanges involving a number of requests for information or "RFI's." In these RFI's, Morganti sought additional clarification and information from the FBOP necessary to complete the coordination required for the shop drawings. Several of the RFI's resulted in further modifications, issued as Unilateral Modification Nos. 243 (dated December 11, 1995) and 287 (dated April 26, 1996). It is undisputed that Morganti could not complete Mod 192 shop drawings or begin fabrication of Mod 192 cell panels until the FBOP responded to the RFI's and issued modifications. The FBOP responded to the last RFI relating to Mod 192 on May 7, 1996.

In fact, the coordination and shop drawing process took much longer than Morganti's contemporaneous schedules anticipated. Not only did Morganti start the coordination process in late July 1995, but Morganti took from February 23 through August 13, 1996— 24 weeks—to complete the shop drawings. During that period, several events occurred. Most significantly, on May 3, 1996, while Morganti was still awaiting shop drawings from Maris's cell-panel fabricator, IAC, Maris withdrew from the project. Prior to its departure from the project, Maris's own internal schedules showed that it expected IAC

to deliver all Mod 192 cell panels by July 10, 1996.

Maris's departure led Morganti to take several actions. First, Morganti contracted with the Doug Dailey Company ("DDC") for the shop drawings and fabrication of Mod 192 cell panels. Morganti did not contract with DDC until June 1996. As part of its contract with Morganti, DDC was also given responsibility for another Maris project, the security windows. DDC, in turn, contracted with Georgia Detention Windows ("GDW") to fabricate the cell panels and security windows, and with Industrial Drafting to prepare the shop drawings. Mr. Sabino testified that he finished the coordination process by June 10, 1996, and immediately traveled to Alabama to work with DDC and its subcontractor to prepare final shop drawings. An early schedule prepared by Steve Rivers of DDC anticipated that DDC would complete shop drawings for the Mod 192 cell panels for FBOP approval by July 29, 1996, and begin fabrication of the cell panels by September 2, 1996. However, DDC did not submit the shop drawings for FBOP approval until August 13, 1996.

Sometime in August 1996, Morganti elected not to use GDW to fabricate the Mod 192 cell panels. Instead, on September 11, 1996, Morganti contracted with Pioneer Industries to fabricate the 387 Mod 192 panels. Pioneer contended that the shop drawings prepared by DDC/GDW were not accurate and required re-engineering. This briefly delayed Pioneer's ability to begin fabrication of the Mod 192 cell panels.

Although Pioneer would not agree to be bound by a fabrication schedule, Morganti outlined its anticipated fabrication schedule in the purchase order as follows [5]:

1. Cell Block A, floors 4 through 6 mezzanine on or before September 20, 1996;
2. Cell Block B, floors 4 through 6 mezzanine on or before September 27, 1996;
3. Cell Block C, floors 4 through 6 mezzanine on or before October 11, 1996; and

---

5. The agreement between the parties provided that Pioneer would not be held contractually

liable to Morganti's schedule.

4. remaining panels on or before November 20, 1996.

Pioneer commenced fabrication of the Mod 192 cell panels on September 16, 1996, within one week after the FBOP returned the shop drawing comments on September 10, 1996. Pioneer did not deliver the first priority Mod 192 cell panels to the site until October 1996. Subsequently, Genetech, Morganti's panel installer, commenced installation of Mod 192 cell panels on November 4, 1996.

It was at this time that Morganti's project manager, John Rhodes, reported in a November 13, 1996 memorandum that Morganti could meet a late October 1997 substantial completion date if panel fabrication remained on schedule. As indicated above, Mr. Rhodes's schedule required that all of the cell panels for floors 4 through 6M, including Mod 192 and typical cell panels, be installed in cell block A by December 24, 1996, cell block B by January 8, 1997, and cell block C by January 17, 1997. In addition, the schedule required installation of all cell panels for floors 7 through 8M, including Mod 192 and typical cell panels, in all three cell blocks by February 19, 1997, and for the entire 9th floor by March 12, 1997.

As it turned out, Pioneer was never able to meet Morganti's schedules. By January 9, 1997, one day before the FBOP issued the cure notice, Pioneer had delivered only 137 panels out of the 387 panels it was required to fabricate, and even then there were still critical utility panels for cell block C on floors 4 and 4M that had not been delivered. Pioneer's continued poor performance caused Morganti to write on February 10, 1997, complaining that "Pioneer Industries apparently still cannot produce panels on the eight day cycle which you committed to initially.... Any further delays in the delivery of the remaining panels will have a disastrous effect on our construction schedule." Pioneer finally delivered the last of the Mod 192 cell panels (for floors other than the 9th floor) in April 1997.

In order to address Pioneer's schedule delays, in February 1997, Morganti contracted with Maximum Security Products ("MSP") to assemble 36 panels, composed of parts that had been fabricated by Pioneer. MSP assembled 40 panels between February 6 and 13, 1997.

## C. Problems with Pioneer's Mod 192 Panels

In addition to the problems Morganti experienced in securing the timely manufacture of Mod 192 cell panels from Pioneer, Morganti was delayed by the poor quality of Pioneer's work. The court heard testimony from Nigel Taylor, a CRSS inspector on the project, regarding problems discovered in the Mod 192 utility panels.[6] Mr. Taylor testified that on December 4, 1996, Chris Burke, another CRSS inspector, discovered that Pioneer had improperly manufactured almost all of the Mod 192 utility panels for cell blocks A and B. Apparently, the length of the panel connector piece was not deducted from the length of the panel and therefore these panels were too long, which caused certain penetrations to be misaligned. This manufacturing defect required the installation contractor, Genetech, to perform remedial work in the field. Mr. Taylor testified that these repairs were ongoing between March 3 and April 14, 1997. This remedial work delayed installation of the cell panels, which in turn delayed installation of follow-on MEP work.

## D. Other Cell Panels

In addition to falling behind schedule on fabrication of the 387 Mod 192 cell panels, Morganti also fell behind schedule in its fabrication and installation of all the remaining typical cell panels. After Maris left the project, Morganti needed an additional 1317 typical cell panels to complete the project. IAC, the original cell-panel fabricator under Maris, ceased cell-panel fabrication after Maris left the project in May 1996. Although there

6. For security reasons, the MEP work for each cell is housed in a vertical triangular utility chase, which allows utility services to be delivered to inmates while preventing the inmates from having access to the interior MEP work.

The utility chase consists of a "Y" shaped panel, two "utility" panels, and a chase panel. The utility services are provided to inmates in the two cells adjacent to each chase via penetrations in the utility panels.

was a backlog of typical panels on site when Maris left, Morganti did not contract with IAC until September 23, 1996, and IAC did not begin fabricating the remaining 1317 cell panels until sometime after October 2, 1996.

In addition to the typical cell panels, IAC was also required to manufacture a number of "custom panels." Apparently, 36 custom panels were required after Nasso, Morganti's concrete subcontractor, improperly constructed 36 punched window openings located at the northwest and southwest corners of cell blocks A and B. The exterior concrete openings did not match the openings in the back cell panels, and IAC had to redesign each affected back panel as a custom panel. Although it is unclear when these custom panels were fabricated, the evidence established that they were released for fabrication in the winter of 1995 and loaded into the building before the Mod 192 cell panels.

In order to meet the September 1997 schedule, Morganti sought to have IAC fabricate all of the remaining 1317 typical cell panels by November 8, 1996, in the following order of priority: (1) cell block A; (2) cell block B; (3) cell block C; and (4) floors 8M and 9. As with Pioneer, IAC was not able to meet this schedule. Mark Boe, who assisted in the preparation of the CPMI expert report, testified that Morganti's WC04 schedule required that IAC achieve a production rate of 40 panels per day. In fact, IAC produced just seven panels per day.

Another internal Morganti memorandum from Mr. Rhodes to Mr. Catino revealed that by November 12, 1996, Morganti had determined that the slow delivery of the 4th floor typical panels was causing schedule slippage. On November 11, 1996, Mr. Rhodes had written to IAC that delivery of priority 3 cell panels for cell block C "on December 2 is absolutely critical ... to maintain an installation schedule 21 working days behind." Despite Mr. Rhodes's "pushing," by late November Morganti was still receiving priority 1 cell panels for cell block A. Then, on December 11, 1996, Mr. Catino wrote to IAC, explaining that the scheduled delivery of pri-

ority 3 cell panels for cell block C on December 9, 1996, had "slipped," and that the "new target date" was December 23, 1996. Yet as of January 30, 1997, priority 3 cell panels for cell block C on the 4th floor still had not been delivered. At the time of termination in April 1997, IAC had just delivered the cell panels for 8M, but had not yet delivered any of the 9th floor cell panels.

**E. Contemporaneous Time Requests**

On November 6, 1996, following the parties' Schedule B Agreement and contemporaneous with the first Mod 192 panels arriving on site, Morganti submitted a Time Impact Analysis ("TIA") prepared by its scheduling expert, WHI.[7] Importantly, Morganti submitted the WHI TIA sometime after Maris's departure, and just as the Mod 192 cell panels were being delivered. Therefore, WHI was able to incorporate these events into its schedule analysis. Based on its evaluation of the delay to the schedule through Morganti's WC07 schedule update, dated September 30, 1996, WHI concluded that Morganti was entitled to a time extension of 213 work days, which would extend the Schedule A December 31, 1996 contract completion date to October 30, 1997.

In the TIA report, WHI stated that there were two significant reasons why the January 1997 substantial completion date in Morganti's original Schedule B–WC01 had been revised to a September 1997 substantial completion date in WC04. First, WHI noted that Maris's departure from the project had an impact of 64 work days of delay. Second, WHI explained that the impacts to the MEP follow-on work that were caused by the resequencing required by Mod 192 were not recognized in WC01. Thus, WHI stated that the substantial completion date in WC04 had been revised to reflect the impact of these events. Morganti abandoned the WHI analysis at trial.

**F. Expert Delay Analyses**

Mr. McDonough provided expert scheduling analysis on behalf of Morganti at trial.

---

7. The time impact analysis or "TIA" is a method of assessing and proving contractor claims of delay using critical path method or "CPM"

scheduling. The contract between Morganti and the FBOP required that Morganti submit a TIA in support of any requests for time extensions.

Mr. McDonough's opinion as to the extent of excusable delay that Morganti experienced was based on his as-built analysis of Morganti's performance as compared with Morganti's Schedule A and WC01 schedule. Mr. McDonough's as-built analysis reflected Morganti's progress on the project from its first day through the April 30, 1997 termination and included Mr. McDonough's projections as to how Morganti would have completed the project from May 1, 1997, through May 26, 1998, had it not been terminated.[8] Based on this detailed as-built schedule, Mr. McDonough testified that the as-built critical path of the project ran through Mod 192. Mr. McDonough then explained that the "total time" from January 1996 until project completion that Morganti spent to address Mod 192 and its surrounding impacts represented the duration of the FBOP-caused delay to the critical path, which entitled Morganti to a time extension to May 26, 1998.

In particular, Mr. McDonough testified that Mod 192 delayed the critical path of the project a total of 511 calendar days and that the FBOP was the sole cause of this delay. Under Mr. McDonough's analysis, Morganti was entitled to a time extension due to excusable delay for every day that it took for the coordination, fabrication, and installation of the Mod 192 and associated cell panels, from January 1996, until the follow-on MEP work was completed. Mr. McDonough began counting the 511 days of delay from January 1, 1996, and not the date Mod 192 was issued, because Morganti had already been given a time extension until December 31, 1995, in earlier contract modifications.

In this connection, Mr. McDonough testified that Morganti was entitled to 293 calendar days of delay for coordination and fabrication of Mod 192 cell panels. In addition, Mr. McDonough's partner and President of MBP, Charles Boylard, testified regarding the complexity of the follow-on MEP work and the loss of productivity that resulted from the resequencing of work caused by Mod 192. Mr. McDonough relied on Mr. Boylard's expertise to justify his conclusion

that Morganti was entitled to an additional 218 calendar days for the follow-on MEP work.

Mr. McDonough further testified that to the extent Morganti caused any delay in connection with the project, that delay was "concurrent delay." In addition, Mr. McDonough testified that the problems that Morganti encountered with the fabrication and installation of Pioneer's Mod 192 cell panels were "reasonable," and therefore should not limit the number of days of excusable delay due to Mod 192. Finally, Mr. McDonough testified that Maris's departure did not delay the project. Rather, he testified that Morganti mitigated any delay caused by Maris's departure by securing Pioneer, a second cell-panel manufacturer, to fabricate Mod 192 cell panels while IAC fabricated the remaining typical cell panels.

Mr. Brennan, the FBOP's expert, presented a very different assessment of the impacts of Mod 192. Using a TIA method of evaluating delays, Mr. Brennan compared Morganti's WC01 schedule with Morganti's schedule updates and the as-built schedule, to determine the cause and effect of any critical path delays. Mr. Brennan concluded, based on his TIA analysis, that Morganti was not entitled to any extension of the December 31, 1996 contract completion date because of the changes caused by Mod 192. In his expert opinion, the coordination, fabrication, and installation of Mod 192 cell panels were never on the critical path of the project, and thus did not cause delay to the project as a whole. Contrary to Mr. McDonough's testimony, Mr. Brennan testified that all of the critical path delays to the project's completion date were caused solely by Morganti.

In particular, Mr. Brennan testified that his view of Morganti's contemporaneous schedules showed that at the time Mod 192 was issued in July 1995, Morganti was plagued by critical path delays associated with repairing deficient concrete work and fabrication of the typical cell panels. Mr. Brennan maintained that these delays provided more than enough "float" in the sched-

---

8. Mr. McDonough arrived at his post-termination projections of excusable delay based on the activity durations and schedule logic in Morganti's

WC10 December 31, 1996 schedule, updated for actual progress and delays through termination.

ule for Morganti to design, fabricate, and install the limited number of Mod 192 cell panels without delaying the critical path. In addition, Mr. Brennan challenged Mr. McDonough's contention that Mod 192 caused Morganti's resequencing delays. Mr. Brennan testified that Morganti was forced to change the sequencing of work, and hence leave out many more cell panels than just those affected by Mod 192, because of a series of choices that were dictated by the concrete and masonry subcontractors, and not by Mod 192. In sum, Mr. Brennan concluded that the activities associated with Mod 192 were never on the critical path, and thus Morganti was not entitled to any additional time.

### G. Liquidated Damages

Beginning in March 1997, the FBOP assessed liquidated damages against Morganti at a rate of $7,000 per day, from January 1, 1997, through termination, for a total of $840,000. Steven Paul, another contracting officer assigned to assist Ms. Moore on the project, testified that upon review of the Schedule B Agreement, he came to believe that the assessment of liquidated damages against Morganti was improper.

### IV. FACTS RELATING TO BREACH OF CONTRACT CLAIM

As an alternative defense to the FBOP's default termination, Morganti also presented testimony regarding its claim that the FBOP materially breached its contract with Morganti, thereby precluding the FBOP from terminating Morganti for default. In this connection, Morganti presented evidence to establish that the FBOP: (1) failed to make timely progress payments; (2) made excessive withholdings and baseless retainage; (3) failed to remit timely and complete payments on modifications and CPC's; and (4) failed to maintain sufficient project funding. The facts with respect to each breach claim are discussed below.

### A. Progress Payments

The parties do not dispute that during the course of the project, the FBOP made $82 million in progress payments in accordance with the terms of the contract. Under the prompt payment clause of the contract, F.A.R. 52.232–27, the FBOP was obligated to make progress payments within 14 days of receiving a proper requisition for payment. However, based on the mistaken belief that the contract requirements established a 30–day payment period, as provided under a different F.A.R. provision, the FBOP consistently paid Morganti on a 30–day schedule.

At trial, Morganti presented the testimony of Patrick Menefee, one of Morganti's contract administrators, who testified that he objected as early as 1994 to the 30–day payment period, but was told by Ms. McBride that the contract provided for a 30–day payment period. Ms. McBride testified that she did not recall Morganti ever complaining about her using the wrong payment period. Specifically, she recalled that Morganti's only complaints concerned rejected payment requisitions, withholdings, and retainages. Ms. McBride testified that Morganti "[n]ever brought it to my attention about the 14 days, or that would have been corrected." Morganti presented no evidence to show that Mr. Menefee or any other Morganti employee pursued the matter further until April 1997, just before termination.

### B. Retainage and Withholding

In addition to objecting to late progress payments, Morganti also objected to the FBOP's decision to "retain" monies from progress payments for lack of progress, and then to "withhold" additional monies for deficient work. It is undisputed that in May 1995 the FBOP began retaining a maximum of 10 percent from every progress payment to Morganti under F.A.R. 52.232–5(e) for lack of adequate progress. According to Morganti's financial expert, Mr. Fuchs, the FBOP's retainages totaled more than $4 million over the course of the project. It is also undisputed that over and above these retainages, the FBOP "withheld" portions of progress payments at various times throughout the course of the project, starting with Progress Payment 9 in October 1994. The FBOP withheld money from progress payments for defective work identified through specific de-

ficiency and omission reports, or "D & O's," under F.A.R. 52.232–5(b).[9]

Ms. McBride testified that the most significant withholding came from Progress Payment 17, dated June 23, 1995, against which the FBOP withheld $3.2 million for concrete repair work. Ms. McBride explained that she withheld the entire amount due for concrete work because, at the time, it was difficult to ascertain the true extent of the value of the necessary repairs. Realizing that she could not withhold the entire amount due for concrete work, on July 14, 1995, Ms. McBride released $3.2 million to Morganti in Progress Payment 18A, which represented the amount that she had withheld from Progress Payment 17 (minus the 10 percent retainage the FBOP was contractually authorized to retain because Morganti was then behind schedule). Subsequently, the parties reached an agreement on a concrete repair plan that provided itemized values for various repairs. Pursuant to the concrete repair plan, the FBOP withheld $1.9 million from Progress Payment 18 for the defective concrete work that Morganti had performed during May and June 1995. Morganti and the FBOP agreed that this was a fair valuation of the cost to repair these defects. Thus, for a period of 20 days, the FBOP was withholding more than $1 million in excess of the actual value of the concrete repairs.

Later in the project, when Ms. Moore became the contracting officer, she released $2 million of the money that was being held as retainage to Morganti. Ms. Moore testified that she released these funds because she knew Morganti needed the money and felt that Morganti might be owed some money for outstanding CPC's yet to be definitized. Ms. Moore testified that she and Morganti agreed that once the CPC's were negotiated and paid, a portion of that money would go back into the FBOP's retainage fund for the project.

**C. Processing CPC's and Modifications**

At trial, the court also heard extensive testimony concerning the FBOP's failure to timely negotiate and make payment on

CPC's and modifications. In particular, Morganti focused on the FBOP's conduct with regard to CPC 53 and CPC 58.

On or about March 28, 1996, Morganti submitted CPC 53 to the FBOP seeking payment of $3,893,261 in direct and indirect costs incurred for out-of-sequence work, winter concrete placement, and acceleration costs caused by excusable winter weather delays during the winter of 1994–1995. Morganti and the FBOP began negotiations on CPC 53 in August 1996, and in February 1997, they agreed to settle CPC 53 for $2.73 million. Ms. Moore explained at trial that the FBOP's payment in connection with CPC 53 was conditioned on Morganti's concrete subcontractor withdrawing a Freedom of Information Act request relating to project funding. Morganti provided its consent to the condition on April 29, 1997, one day before Morganti was terminated for default. As a consequence, CPC 53 was not definitized and Morganti was not paid for the CPC.

Morganti submitted its original proposal for CPC 58 on May 1, 1996, in the amount of $307,282, for costs claimed by approximately 20 subcontractors, incurred as a result of cold weather delays experienced during the winter of 1994–1995. On May 31, 1996, the FBOP requested that Morganti submit a revised CPC 58.

Subsequently, on August 19, 1996, Morganti submitted its revised CPC 58 in the amount of $8,174,485. Ms. Moore testified that the increase from Morganti's original CPC 58 was due to money claimed for indirect costs, including extended overhead, associated with the time extension of 176 calendar days (167 compensable calendar days) granted in Mods 056, 057, 103, 104, and 108. In early November 1996, Ms. Moore concluded that the indirect costs requested in CPC 58 necessitated an audit. The audit was not completed as of the time of termination, and as such CPC 58 was not definitized.

**D. Project Funding**

Morganti also presented evidence regarding the overall status of funding for the

9. During trial, the court heard substantial testimony regarding the D & O's issued to Morganti. Through this testimony, the FBOP established that Morganti's work was less than perfect and that the FBOP was not unreasonable in holding Morganti responsible for correcting the defects.

project. Apparently in April 1994, Mr. Chin, the FBOP architect and project manager, requested an additional $15.3 million in project funding based on his projections of the project's funding needs, including contingencies, but the FBOP denied the request. Then in 1995, Mr. Chin made additional funding requests ranging from $9.3 million to $12 million, and the FBOP also denied these requests.

Ms. McBride and Ms. Moore both explained that despite the denial of Mr. Chin's funding requests, at no time did a lack of funds delay negotiation of CPC's and unilateral modifications. Ms. Moore and Ms. McBride both testified that they were always free to negotiate payment for modifications or CPC's without regard to funding availability. In addition, Scott Cohen, the FBOP's project cost manager, testified that funding was always made available once negotiations on a CPC were completed. Mr. Cohen explained that pursuant to standard FBOP practice, the FBOP never keeps a project fully funded, but instead transfers funds into a specific project budget as the funds are needed.

The evidence also established that several unilateral modifications and CPC's were definitized during the period of alleged FBOP funding shortfalls. However, Ms. McBride testified that there was a brief delay in definitizing CPC 8B. Ms. McBride testified that she and Morganti had concluded negotiations regarding the amount due to Morganti for CPC 8B in December 1995, but that she could not immediately definitize the CPC because funding had not yet been transferred into the project budget. Mr. Cohen then testified that in January and February 1996, approximately $10 million was transferred into the project budget. Subsequently, by March 1, 1996, the FBOP and Morganti had definitized CPC 8B for $800,220 with Modification No. 260.

## V. DISCUSSION

### A. The Termination for Default

### 1. Standard of Review

■ It is well settled that "default-termination is a drastic sanction, which should

be imposed (or sustained) only for good grounds and on solid evidence." *Lisbon Contractors, Inc. v. United States,* 828 F.2d 759, 765 (Fed.Cir.1987) (citations omitted). The government bears the initial burden of proof to show that the contractor was in default at the time of termination. *Id.* at 763–64. Here, the FBOP exercised its power to terminate Morganti's contract for default under FAR 52.249–10(a), which permits the contracting officer to terminate for default if the contractor "refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension . . . ."

■ A termination for default for failure to prosecute the work requires "a reasonable belief on the part of the contracting officer that there was 'no reasonable likelihood that the [contractor] could perform the entire contract effort within the time remaining for contract performance.'" *Lisbon Contractors,* 828 F.2d at 765 (alteration in original) (quoting *RFI Shield–Rooms,* ASBCA Nos. 17374, 17991, 77–2 BCA ¶ 12,714, at 61,735, 1977 WL 2320 (1977)). A termination for failure to make progress usually occurs where the contractor has fallen so far behind schedule that timely completion has become unlikely. *Hannon Elec. Co. v. United States,* 31 Fed.Cl. 135, 143 (1994), *aff'd,* 52 F.3d 343 (Fed.Cir.1995) (table). In this connection, the government is not required to prove that it was impossible for the contractor to complete performance on time. *Lisbon Contractors,* 828 F.2d at 765. Rather a termination for default will be upheld where "a demonstrated lack of diligence indicates that [the government] could not be assured of timely completion." *Id.* (alteration in original) (citing *Discount Co. v. United States,* 213 Ct.Cl. 567, 575, 554 F.2d 435, 441 (1977); *Universal Fiberglass Corp. v. United States,* 210 Ct.Cl. 206, 537 F.2d 393, 398 (1976)).

F.A.R. 49.402–3(f), "Procedure for Default," provides a list of factors that the contracting officer should consider when exercising her discretion to terminate a con-

tractor for default. These factors include, but are not limited to: the contractor's excuses for the failure; the availability of the contract work from other sources; the urgency of the need for the contract work; and the period of time required to obtain the contract work as compared with the period of time in which the current contractor could perform. *Id.* at 49.402–3(f).

▆ In addition, courts and contract boards of appeal have held that in determining whether to terminate a contractor for default, the contracting officer may consider, among other things: the contractor's failure to meet its own representations concerning the progress of the work (*e.g., Guenther Systems,* ASBCA No. 14032, 72–1 BCA ¶ 9443, at 43,869, 1972 WL 1392 (1972)); the percentage of work completed and the percentage of time expended (*e.g., Olympic Painting Contractors,* ASBCA No. 15773, 72–2 BCA ¶ 9549, at 44,474 (1972)); monthly progress reports indicating that delivery will be late and an additional time extension is sought (*e.g., Fitzgerald Labs., Inc.,* ASBCA Nos. 15205, 15594, 71–2 BCA ¶ 9029, at 41,937, 1971 WL 1683 (1971)); as well as a contractor's performance history (*e.g., Decker & Co. v. West,* 76 F.3d 1573, 1581 (Fed.Cir.1996)). Against this backdrop, the court will examine Ms. Moore's decision to terminate Morganti for default.

## 2. Schedule B Substantial Completion Date

In order to evaluate whether Morganti was in default, the court must first determine the appropriate contract completion date. The court finds that the official contract completion date was set in Mod 331 as December 31, 1996, and that contrary to Morganti's contentions, the Schedule B Agreement did not formally extend the contract completion date. Morganti failed to present any reliable evidence to support its contention that the Schedule B Agreement formally extended the contract completion date to September 22, 1997, or that the parties agreed that any future time extensions would be added to the September 22, 1997 substantial completion date identified in WC04. To the contrary, the parties executed several bilateral contract

modifications following the Schedule B Agreement, in which they expressly recognized December 31, 1996 as the contract completion date, including Mods 340, 341, 342, 343, 344, 345, 350, 353, 354, and 356. Indeed, Morganti recognized that December 31, 1996 was the contract completion date in its November 6, 1996 TIA for Mod 192, in which Morganti sought a time extension of 213 work days from December 31, 1996, until October 30, 1997.

Nonetheless, the court further finds that under the terms of the Schedule B Agreement, the parties recognized Morganti's WC04 schedule update as the controlling schedule, and under WC04 the substantial completion date was September 22, 1997. It is undisputed that the FBOP agreed not to terminate Morganti so long as Morganti was making progress toward achieving the substantial completion date of September 22, 1997 that it represented in WC04. As noted above, Ms. McBride, Mr. Chin, and Ms. Moore, as well as Mr. Catino, all understood that the purpose of the Schedule B Agreement was to allow Morganti to continue working beyond the contract completion date of December 31, 1996, as set by the parties in Mod 331, while the FBOP evaluated whether Morganti was owed additional time due to Mod 192.

Finally, the court finds that the parties provided in the Schedule B Agreement that if Morganti was due any extension of time, that time would be added to the December 31, 1996 contract completion date, and not to the September 22, 1997 substantial completion date in WC04. As discussed further with respect to Morganti's claim for an additional 511 calendar days of excusable delay, the court finds that by the plain terms of the agreement, the parties agreed that any extensions of time would be evaluated under WC01, which projected a substantial completion date of January 5, 1997, and was intended to "match up" with Schedule A's substantial completion date of December 31, 1996. The parties further agreed that the September 22, 1997 date in WC04 would only be extended if Morganti could show that it was owed a time extension that extended the December 31, 1996 official substantial com-

pletion date beyond the September 22, 1997 substantial completion date set in WC04.[10] The parties' understanding in this regard is reflected in Morganti's November 6, 1996 request for an extension of time from December 31, 1996, until October 30, 1997.

In view of the foregoing, the FBOP's case turns on whether Ms. Moore had a "reasonable belief" that there was "no reasonable likelihood" that Morganti could complete the project by the September 22, 1997 substantial completion date.

### 3. Ms. Moore Was Justified in Terminating Morganti for Default

■ The court finds that at trial the FBOP established that Ms. Moore's decision to terminate Morganti for default was reasonable and supported. There is simply no serious dispute that at the time Morganti was terminated in April 1997, Morganti was not going to meet the September 22, 1997 substantial completion date set in WC04. Indeed, Morganti concedes as much. In its April 11, 1997 response to the show cause notice issued by Ms. Moore on March 25, 1997, Morganti stated that there had been slippage in the schedule since the January 1997 cure notice and that it could not substantially complete the project until at least December 1997—three months after the WC04 completion date. According to later Schedule B updates, Morganti was projecting that it would not achieve substantial completion until January or March 1998.

In addition, Mr. McDonough, Morganti's own scheduling expert, estimated that Morganti would not have achieved substantial completion until May 26, 1998—eight months after the substantial completion date in WC04. Mr. McDonough testified that Morganti could probably have shortened that date by four months if the FBOP had been willing to pay for acceleration. However, even using Mr. McDonough's accelerated estimate for substantial completion by January 1998, Morganti would still have exceeded the

agreed-upon September 22, 1997 substantial completion date. Thus, the court finds that Ms. Moore was reasonable in her belief that Morganti would not complete the project in time.

■ Finally, the court finds that contrary to Morganti's contentions, Ms. Moore gave adequate consideration to the requirements in F.A.R. 49.402–3(f) in making her termination decision. In particular, the court finds that Ms. Moore properly considered the amount of work remaining for Morganti to complete the project, the amount of time it would take Morganti to complete the remaining work, whether Morganti or another contractor could perform the work more expediently, and whether Morganti was entitled to an extension of time that would have given Morganti sufficient time to complete the project.

■ The court notes that a contractor must satisfy a significant burden of proof when arguing that a termination for default should be invalidated as an abuse of discretion. *Mega Constr. Co. v. United States*, 29 Fed.Cl. 396, 422 (citing *Continental Bus. Enterprises, Inc. v. United States*, 196 Ct.Cl. 627, 637–38, 452 F.2d 1016, 1021 (1971)). As detailed in the statement of facts, Ms. Moore went through each phase of the termination process with care. Morganti was given several opportunities to show whether it could come close to the September 22, 1997 substantial completion date. The evidence proves that Morganti was never able to do so. Indeed, Morganti's own schedules showed a substantial completion date that had slipped beyond January 1998. Moreover, Morganti's only outstanding request for a time extension at termination, WHI's November 1996 TIA, sought an extension until only October 30, 1997. In such circumstances, Ms. Moore's termination decision was justified.

■ Accordingly, Morganti's contention that the termination for default was improper because Ms. Moore neglected to consider

---

10. The court finds that Ms. Moore's statements regarding the possibility of extending both the December 31, 1996 and the September 22, 1997 substantial completion dates must be discounted, as they are inconsistent with the FBOP's contemporaneous understanding and Morganti's contemporaneous conduct. Moreover, Ms. Moore was not present for the negotiation or drafting of the Schedule B Agreement.

all the factors set forth in the F.A.R. is without merit. It is well settled that "[f]ailure to consider one or more of the [F.A.R.] factors should not invalidate a termination for default where the totality of the circumstances demonstrates a reasonable exercise of discretion." *Lafayette Coal Co.*, ASBCA No. 32174, 89–3 BCA ¶ 21,963, at 110,482, 1989 WL 74885 (1989). As stated by the Federal Circuit in *DCX, Inc. v. Perry*, 79 F.3d 132, 135 (Fed.Cir.1996), "[a] contracting officer's failure to consider one or more of the section 49.402–3(f) factors therefore does not require that a default termination be converted into a termination for the convenience of the government."

In this connection, the court notes that Morganti made much of Ms. Moore's memory lapses and her decision not to keep her personal notes regarding her decision to terminate Morganti for default. Ultimately, however, the court found Ms. Moore to be a credible witness. It was evident that based on the information presented to her and after giving Morganti the benefit of the doubt, Ms. Moore reached the reasonable conclusion that Morganti would not be able to get the job done within the time frame to which the parties had agreed. While Ms. Moore may not have had perfect knowledge, she had sufficient knowledge to make a sound and reasonable judgment.

Given the court's finding that Morganti could not meet the Schedule B substantial completion date, or even the October 30, 1997 date sought by Morganti in its November 1996 request for a time extension, the case turns on whether Morganti can establish that its admitted delay beyond September 1997 was excusable under the excusable delay clause of the default provision, F.A.R. 52.249–10(b).

## B. Excusable Delay

### 1. The Contractor's Burden

Under the excusable delay clause, the contractor has the burden of proving that the delay was excusable under the terms of the default provision of the contract. F.A.R. 52.249–10(b); *Sauer Inc. v. Danzig*, 224 F.3d 1340, 1345 (Fed.Cir.2000)

(citing *International Electronics Corp. v. United States*, 227 Ct.Cl. 208, 231, 646 F.2d 496, 510 (1981)). A termination for default may be converted to a termination for convenience of the government only where the contractor can establish that "[t]he delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor." F.A.R. 52.249–10(b); *Sauer Inc.*, 224 F.3d at 1345.

In addition, it is well settled that: When a contractor is seeking extensions of contract time, for changes and excusable delay, which will relieve it from the consequences of having failed to complete the work within the time allowed for performance, it has the burden of establishing by a preponderance of the evidence not only the existence of an excusable cause of delay but also the extent to which completion of the contract work as a whole was delayed thereby.

*Santa Fe, Inc.*, VABCA No. 1943, 84–2 BCA ¶ 17,341, at 86,410, 1984 WL 13360 (1984) (quoting *Wilner Constr. Co.*, VABCA No. 1421, 80–2 BCA ¶ 14,529, at 71,628, 1980 WL 3020 (1980)). Thus, the contractor must demonstrate that the excusable event caused a delay to the overall completion of the contract, i.e., that the delay affected activities on the critical path. *Sauer Inc.*, 224 F.3d at 1345 (citing *Mel Williamson, Inc. v. United States*, 229 Ct.Cl. 846, 850–51 (1982)). In this connection, the contractor must also establish the extent to which completion of the work was delayed. A contractor "is entitled to only so much time extension as the excusable cause actually delayed performance." *Robert P. Jones Co.*, AGBCA No. 391, 76–1 BCA ¶ 11,824, at 56,457, 1976 WL 24288 (1976) (citations omitted). However, the fact that the contractor may also have caused concurrent delay is not fatal to the contractor's claim for additional time due to excusable delay. "If a period of delay can be attributed simultaneously to the actions of both the Government and the contractor, there are said to be concurrent delays, and the result is an excusable but not a compensable delay." *Weaver–Bailey Contractors, Inc. v. United States*, 19 Cl.Ct. 474, 476 (1990); *Utley–*

*James, Inc.,* GSBCA No. 5370, 85–1 BCA ¶ 17,816, at 89,109, 1984 WL 13874 (1984) (citing *Dawson Constr. Co.,* GSBCA No. 3998, 75–2 BCA ¶ 11,563, at 55,204, 1975 WL 1808 (1975)).

## 2. The Impact of Schedule B on Delay Analysis

As an initial matter, the court must address the impact of the Schedule B Agreement on the delay analysis. As discussed above, the court finds that in entering the Schedule B Agreement, the parties established how to evaluate and calculate time impacts caused by Mod 192. In particular, the parties apparently recognized that Schedule A was no longer workable and that Morganti's WC01 update was also unrealistic. The plain terms of the Schedule B Agreement provide:

Actualized dates and activities defined within [Morganti] Work to Complete Schedule B, Update WC04, Data Date May 31, 1996 shall be the actualized dates for all respective activities in any preceding [Morganti] Work to Complete Schedule B updates. *Any new activities/logic reflected in WC04 shall apply to all previous Work to Complete Schedule updates.*

All future impacts, from February 22, 1996 until project completion, shall be evaluated on the basis of the Work to Complete Schedule WC01. Any future extensions of time, shall be inputted into the accepted Contract Schedule (Schedule A).

(Emphasis added).

Based on the plain language in the Schedule B Agreement, the court finds that the parties intended to be guided by the durations and logic contained in the WC04 update for measuring progress and assessing any delays after February 22, 1996. In addition, as explained above, to the extent such delays were identified, the parties provided that any time extensions would then be added to the December 31, 1996 official substantial completion date set in Mod 331. Accordingly, the court concludes pursuant to the Schedule B Agreement that in order to evaluate whether any FBOP-caused delays required a contract extension, the parties must look to WC04 to determine the time impact, if any, and add that time to December 31, 1996.

Significantly, at trial neither of the parties fully addressed the complexity added to the delay analysis by the Schedule B Agreement. Although Morganti's trial expert, Mr. Mc-Donough, recognized that the parties agreed in the Schedule B Agreement that Morganti's WC04 schedule update would serve as a baseline schedule after February 22, 1996, his delay analysis never referenced the durations or logic in Morganti's WC04 schedule update. Rather, Mr. McDonough determined the number of days of excusable delay by comparing the as-built schedule with Morganti's Schedule A and WC01 schedule. Mr. Brennan, the FBOP's trial expert, also relied on WC01 as the baseline as-planned schedule, as compared with WC04 and other Morganti schedule updates, and Morganti's as-built progress to determine whether the FBOP caused any excusable delay. However, Mr. Brennan's analysis rejected the possibility that the Schedule B Agreement represented some acknowledgment on the part of the FBOP that Mod 192 may have caused some excusable delay beyond December 31, 1996.

Ultimately, however, the court must be guided by what the parties agreed to and bargained for in the Schedule B Agreement, despite the expert testimony. The court's "paramount focus is the intention of the parties at the time of contracting; that intention controls in any subsequent dispute." *King v. Dep't of the Navy,* 130 F.3d 1031, 1033 (Fed. Cir.1997) (citing *Greco v. Dep't of the Army,* 852 F.2d 558, 560 (Fed.Cir.1988)). It is in view of the parties' understanding in the Schedule B Agreement that the court now turns to Morganti's excusable delay claim.

## 3. Critical Path

Based on the parties' understanding in the Schedule B Agreement, the court finds that Mod 192 caused some delay to the critical path by interfering with the sequencing of cell-panel installation as well as follow-on MEP work, and thus Mod 192 caused delay to the project as a whole. The full extent of that delay will be analyzed below. At the outset, however, the court rejects Mr. Bren-

nan's contention that the Mod 192–related work was never on the critical path. Morganti's WC04 schedule indicates that the critical path of the project ran through fabrication and installation of cell panels, and then would eventually move on to the follow-on MEP work. The court notes that Morganti's WC04 schedule reflects that both Mod 192 and typical cell panels were on the critical path, and thus the delay caused by Mod 192 is apparently characterized by Morganti as concurrent delay. Notwithstanding, for the reasons that follow, the court concludes that Morganti failed to establish a right to the 511 calendar days of excusable delay that it claims.

### 4. Delay Attributable to Mod 192

Morganti claims that the Mod 192 changes caused 511 calendar days of excusable delay to the project, which would extend the contract completion date to May 26, 1998. Morganti's scheduling expert, Mr. McDonough, attributes 293 days of critical path delay for coordination and fabrication of Mod 192 panels and 218 days of critical path delay for installation of Mod 192 cell panels and follow-on MEP work.

█ Although Mr. McDonough purported to compare Morganti's as-built performance against Morganti's as-planned Schedule A and WC01 schedule, his analysis is in essence a "total time" approach, which is of virtually no value. Mr. McDonough "simply takes the original and extended completion dates, computes therefrom the intervening time or overrun, points to a host of individual delay incidents for which defendant was allegedly responsible and which 'contributed' to the overall extended time, and then leaps to the conclusion that the entire overrun time was attributable to defendant." *Law v. United States*, 195 Ct.Cl. 370, 382 (1971). It is well settled that this "total time" theory of proving delay is insufficient to meet the contractor's burden to prove that government-caused delay actually delayed the overall completion of the project. *Mel Williamson, Inc.*, 229 Ct.Cl. at 852 (citing *Law*, 195 Ct.Cl. at 382). The "total time" approach to proving delay is "as unsatisfactory as the 'total cost' method of proving damages," because it

assumes that the government is responsible for all of the delay. *Law*, 195 Ct.Cl. at 382.

The court also has serious problems with the FBOP's expert analysis. The FBOP's expert, Mr. Brennan, testified that Morganti is not entitled to any excusable delay for delay caused by Mod 192. Mr. Brennan explained that Morganti's WC01 schedule was a reasonable estimate of the time required for implementation of Mod 192 and completion of the project by January 1997. Mr. Brennan further testified that based on his examination of the project as compared with Morganti's as-planned WC01 schedule and as-built progress from February 22, 1996, through termination, it was his opinion that any delays that occurred beyond WC01 were caused by Morganti and not the actions of the FBOP. As noted above, Mr. Brennan did not consider the parties' Schedule B Agreement regarding the use of Morganti's WC04 schedule as a baseline for measuring progress and delays, and thus his analysis disregards the parties' stated intent.

█ In such circumstances, the court's role is to comb through the evidence and determine whether, based on the record, Morganti was entitled to any time beyond December 31, 1996, for critical path delays caused by Mod 192. *Law*, 195 Ct.Cl. at 386–87 (holding court may rely on other evidence in the record where plaintiff's total time theory has been rejected). Although the court's analysis "takes into account the experts' contrary opinions, ... we give most weight to the other evidence in the record, and draw the logical conclusions flowing therefrom." *Cogefar–Impresit USA, Inc.*, DOTCAB No. 2721, 97–2 BCA ¶ 29,188, at 145,199, 1997 WL 484585 (1997). Based on its review of the expert analyses, Morganti's contemporaneous schedules, its November 6, 1996 TIA, and the terms of the Schedule B Agreement, the court concludes that Morganti was entitled to a total time extension of 246 calender days from the December 31, 1996 contract completion date, or until September 3, 1997. Because Morganti was not entitled to an extension of time beyond the September 22, 1997 substantial completion date recognized by the parties in the Schedule B Agreement, the termination for default is affirmed.

### a. Coordination/Fabrication Delays

At trial, Morganti's expert claimed that Morganti was entitled to 293 calendar days—starting from January 1, 1996 through November 3, 1996—to complete coordination, shop drawings, and fabrication of Mod 192 panels. For the reasons that follow, the court concludes that the government was not responsible for this entire period of delay, but rather that Morganti was entitled to 145 calendar days for coordination and fabrication of Mod 192 cell panels.

As explained above, the court has looked to Morganti's WC04 schedule update to gauge the parties' contemporaneous understanding of the time that would be necessary to complete the Mod 192 coordination and fabrication activities. By the time Morganti's WC04 update was issued, Morganti anticipated that it would need 49 calendar days to complete shop drawings before it could begin fabricating the first shipment of Mod 192 panels. Because this was 49 calendar days of critical path delay occurring after the February 22, 1996 cut-off date in the Schedule B Agreement, it must be added to the December 31, 1996 substantial completion date.

In addition to the 49 calendar days Morganti scheduled for shop drawings, the court finds that Morganti was entitled to some, but not all of the time Morganti claimed for the earlier engineering process. The evidence demonstrated that after an exchange of RFI's and several rounds of coordination with trade subcontractors, Morganti forwarded coordination drawings to Maris and IAC on February 23, 1996, so that they could begin to prepare shop drawings. At that time, Morganti estimated that it would take two weeks for Maris to complete the shop drawings. In fact, IAC did not begin preparing shop drawings until April 1996. The FBOP is clearly not responsible for this delay.

Nonetheless, in early April 1996, Maris and IAC requested additional information that Morganti submitted to the FBOP in another series of five RFI's. Morganti established at trial that it could not proceed with completion of the Mod 192 shop drawings until it had received a response from the FBOP, which in the case of RFI No. 1232

required an additional modification to the original Mod 192 design. The FBOP issued Mod 287 in response to RFI No. 1232 on April 26, 1996, and responded to all of Morganti's additional RFI's by May 7, 1996. Based on this delay, the court finds that Morganti is entitled to a time extension of 34 calendar days for FBOP-caused delays occurring during the coordination process.

Although by July 15, 1996, the date Morganti submitted WC04 to the FBOP, Morganti had all the information it needed from the FBOP and estimated that it could complete the shop drawings in 49 days, in fact Morganti took much longer to complete the shop drawings. While Morganti claimed entitlement to this additional time, it failed to prove that any of the delays in completing the shop drawings were caused by the FBOP. Rather, the evidence proved that the delays were Morganti's responsibility.

As noted in the facts, just as the shop drawings were ready to be finalized, Maris, Morganti's principal subcontractor for cell-panel production, left the project. As a consequence, Morganti was required to reprocure contracts for the work of Maris and its subcontractors, including the cell-panel manufacturer, IAC. Contrary to Mr. McDonough's testimony, the court finds that Maris's departure had a significant time impact on Morganti's ability to perform in a timely manner. Morganti admitted as much in its April 11, 1997 response to the FBOP's show cause notice where Mr. Catino stated: "Given the very significant scope and critical path nature of the work covered by Maris' contract (e.g., cell panels, security windows, security electronics), a severe impact to our progress as a result of that abandonment was unavoidable. Morganti has recovered as well or better than could be reasonably expected...."

After Maris's departure, Morganti contracted with DDC and GDW to fabricate Mod 192 cell panels. Mr. Sabino testified that it was not until June 1996, one month after the FBOP had responded to Morganti's last RFI's relating to Mod 192, that he traveled to GDW's offices in Alabama to assist in the preparation of a second set of shop draw-

ings. GDW did not complete the shop drawings until August 13, 1996, when Morganti submitted them to the FBOP for approval. Clearly, none of this time was FBOP-caused delay.

In addition to the time necessary for preparation of the shop drawings, WC04 provided 21 calendar days for the FBOP to approve the shop drawings. The court concludes that Morganti is entitled to this reasonable period of time due to Mod 192. In fact, Morganti submitted the shop drawings to the FBOP on August 13, 1996, and the FBOP returned them on September 10, 1996. Thus, it took the FBOP 6 calendar days longer than anticipated in WC04 to return the shop drawings. Because the FBOP is responsible for this delay, the court finds that Morganti is entitled to this additional 6 calendar days, plus the 21 calendar days Morganti provided in WC04.

Having determined the time that Morganti is owed for coordinating and preparing the shop drawings for the Mod 192 cell panels, the court now turns to fabrication. WC04 provided 35 calendar days for fabrication of the first delivery of critical Mod 192 cell panels. While the court finds that Morganti was entitled to this 35 days, Morganti in fact took much longer to get a critical number of Mod 192 cell panels delivered to the site, such that it was delayed in progressing the critical path onto MEP follow-on activities. The evidence established that Morganti was responsible for all of the delays beyond the 35 calendar days provided in WC04.

Pioneer, Morganti's cell-panel fabricator, took from September 11 to November 13, 1996, to fabricate and deliver the first priority group of Mod 192 cell panels. Under the initial purchase order with Pioneer, Morganti anticipated that Pioneer would deliver the first priority group of cell panels by September 20, 1996. However, later correspondence between Morganti and Pioneer indicates that this shipment was delayed until October 1 and 2, 1996, and was not delivered in full until November 13, 1996. Moreover, Morganti was unable to use all but four of the panels that arrived by October 2, 1996. Morganti, and not the FBOP, is solely responsible for this delay caused by Pioneer.

Following this first delivery, Pioneer was never able to maintain Morganti's fabrication schedule. Indeed, the clear evidence established that delays caused by Pioneer continued to plague the critical path of the project through installation of the Mod 192 cell panels and follow-on MEP work up to the time of the default termination. The court will address this additional delay below in the context of cell-panel and MEP installation delays. In sum, with respect to coordination and fabrication of the Mod 192 cell panels, the court concludes that Morganti was entitled to a 145–calendar–day time extension from December 31, 1996.

### b. Cell-panel Installation and MEP Delays

As contemplated in WC04, once Morganti had a critical number of Mod 192 cell panels delivered to the project site, the critical path of the project would shift from installation of cell panels to follow-on MEP work. Mr. McDonough, Morganti's scheduling expert, testified that Morganti was entitled to 218 calendar days of delay as a result of installation resequencing and additional comeback MEP work required by Mod 192.[11] Again, Mr. McDonough based his conclusion solely on Morganti's as-built schedule. For the reasons that follow, the court concludes that Morganti was entitled to only a 101–calendar–day contract extension for these Mod 192–related activities.

While it is true that Morganti was required to install cell panels and follow-on MEP work under the original contract, the court finds that the changes imposed as a result of Mod 192 caused a definite time impact to these activities. Based on the expert testimony and the November 6, 1996 TIA prepared by WHI on Morganti's behalf, the court is persuaded that the Mod 192 changes required

---

11. Mr. McDonough explained at trial and in his expert report that 84 of the 218 calendar days of delay that he attributed to installation of Mod 192 cell panels and MEP follow-on work were, in fact, delays Mr. McDonough projected would continue if Morganti had not been terminated. Mr. McDonough stated that he based this time on Morganti's WC10 schedule update, revised to reflect Morganti's actual rate of progress at the time of termination. *See infra* note 7.

resequencing of work that created an additional amount of comeback MEP work in the Mod 192 and other Mod 192–affected cells. This additional MEP work could not be completed until the Mod 192 cell panels were fabricated, delivered, and installed into the building. The court further concludes, based on the testimony and contemporaneous evidence, that the 101 calendar days Morganti provided in WC04 to accommodate this comeback MEP follow-on work was a reasonable estimate of the time necessary to account for the delay due to Mod 192 and that Morganti was responsible for any delays beyond the time provided in WC04.

Contrary to Morganti's contentions, Morganti's WC04 schedule update took into account the additional delay caused by the disruption to the sequencing of cell-panel and MEP installation activities arising from Mod 192. As WHI explained in its November 6, 1996 TIA, WC04 reflected substantial revisions that accounted for delays due to Mod 192, which resulted in the September 22, 1997 substantial completion date:

> the impact of the ADA partitions on work in other areas had not been fully understood when the Schedule B was developed.... After further analysis it was realized that *all* chase rough-in on floors with ADA cells was in fact dependent upon having the Modification No. 192 partitions in place. Specifically, the electrical subcontractor can not begin pulling the security wiring "home runs" unless the corner cells, where the ADA cells are located, are completed.

In fact, there is evidence that Morganti anticipated that Mod 192 would result in a loss of productivity and comeback work as early as September 8, 1995.

In this connection, the court notes that when Morganti revised the original Schedule B–WC01 in the WC04 schedule update, it combined cell-panel installation and MEP follow-on work for Mod 192 cells with installation and MEP follow-on work relating to the remaining typical cells for each floor. Thus, the discrete number of days of delay to the critical path attributable to Mod 192 is not readily apparent by looking at WC04 alone. This delay was analyzed, however, in the TIA

prepared for Morganti by WHI. In the Mod 192 TIA, WHI explains that the impact to follow-on MEP work is in large part why WC04 results in a September 22, 1997 substantial completion date. According to WHI, the 185–work–day delay in WC04 is attributable to 49 work days of delay carried over from WC03 and two new events that negatively affected the schedule: (1) Maris's departure; and (2) the impact of Mod 192 on MEP follow-on work in all cell chases. WHI attributed 64 work days of delay to Maris's departure. Simple arithmetic reveals that WHI attributed the remaining 72 work days or 101 calendar days to the impact of Mod 192 on the MEP follow-on work.

While the court heard extensive testimony from Morganti's MEP expert, Mr. Boylard, regarding the complexity of the MEP work within the cell utility chases, Mr. Boylard failed to explain why Morganti's WC04 schedule did not reflect a reasonable estimate of time for comeback work by the MEP trades that was caused by Mod 192. Mr. McDonough likewise could not identify anything that the FBOP did after the November 6, 1996 TIA that would have caused additional delay beyond that which WHI already had attributed to Mod 192 activities in the TIA. To the contrary, the evidence established that Morganti was delayed beyond the 101 calendar days identified in the TIA because of the delays it suffered in getting cell panels fabricated and delivered to the job site in a timely fashion.

Contemporaneous evidence reveals that Morganti conceded that timely cell-panel fabrication and installation were critical to keeping the project on schedule. In an internal memorandum, dated August 23, 1996, Mr. Rhodes, the project manager, wrote:

> *Cell panel delivery and erection through the 6th floor is this project's critical path.* This is key to completion of the project. It is attainable if we would all pull in one direction. It involves a minimal number of panels. The "trick" is to deliver and install the 4, 4M, 5, 5M & 6 remaining panels ASAP as once they are erected cell block finish activities will never catch panel erection.

In addition, Mr. Sabino confirmed at trial that the fall 1996 delivery dates Morganti established for Pioneer for Mod 192 cell panels had to be achieved in order complete the project by September 22, 1997. However, Pioneer was unable to fabricate and deliver cell panels in accordance with the schedule set by Morganti.

The record is replete with documents showing that the critical work of installing cell panels was delayed because Pioneer was late with every delivery of Mod 192 cell panels. As discussed above, Pioneer was late with its first delivery of the critical panels for floors 4 through 6M for cell block A. By January 9, 1997, one day before the FBOP issued the cure notice, Pioneer had delivered only 137 panels, and even then, there were still critical 4th floor panels for cell block C that had not been delivered. On February 10, 1997, Morganti concluded that "Pioneer Industries apparently still cannot produce panels on the eight day cycle which you committed to initially.... Any further delays in the delivery of the remaining panels will have a disastrous effect on our construction schedule." At the time of termination, April 1997, the last Mod 192 cell panels had just arrived on site, although they were expected in December 1996. There is also evidence that the panels delivered by Pioneer contained defects, delaying installation of cell panels and follow-on MEP work even further.

At the same time, Morganti was suffering concurrent delays with respect to typical-cell-panel production. The evidence showed that IAC, which was responsible for manufacturing the remaining non-ADA typical cell panels, was far behind schedule. As Morganti explained at trial, it could not complete the follow-on MEP work on any floor until all the cell panels were installed, including both Mod 192 and typical cell panels. In order to meet the September 22, 1997 substantial completion date, Morganti required IAC to fabricate 1317 typical cell panels between September and November 1996. To this end, Morganti put IAC on a similar fabrication schedule to Pioneer's schedule for Mod 192 cell panels. However, according to Mr. Rhodes, by October 2, 1996, IAC had yet to begin fabricating panels, which meant that they would be delayed in turning over floors 4 through 6M for follow-on MEP work. By November 12, 1996, Morganti projected that delivery of the 4th floor typical panels for cell block C was "absolutely critical" and was causing schedule slippage. It is significant that at the time of termination, none of the 8M or 9th floor cell panels had been installed. In fact, none of the 9th floor cell panels had been fabricated.

The above-noted delays in fabricating typical and Mod 192 cell panels, in turn, negatively affected the follow-on MEP work that was the next activity on the critical path, and ultimately prevented Morganti from meeting its WC04 schedule. Morganti's expert could not explain these fabrication delays other than to say that the Mod 192 changes caused additional delay to installation activities because Mod 192 required resequencing and comeback MEP work. According to Mr. McDonough, Morganti was proceeding at a reasonable pace throughout the installation and MEP period and therefore was entitled to however long it took to accomplish these activities. However, Mr. McDonough's "total time" analysis was wholly lacking in the face of contemporaneous schedule updates showing that the principal thing preventing Morganti from meeting its schedule was the delay caused by Morganti's fabrication subcontractors.

In sum, based on the evidence presented at trial, the court concludes that Morganti was entitled to a 145–calendar–day time extension for coordination and fabrication of Mod 192 cell panels and a 101–calendar–day time extension for installation and MEP follow-on work, for a total time extension of 246 calendar days. If these days are added to the December 31, 1996 contract completion date, Morganti would have been entitled to a contract extension until September 3, 1997. Because the FBOP based its termination decision on Morganti's failure to make sufficient progress to achieve the September 22, 1997 substantial completion date in WC04, the decision must be affirmed.

### 5. Other Grounds for Delay

Finally, there are no other grounds for delay that would entitle Morganti to any

additional time beyond the September 22, 1997 date. In his expert report, Mr. McDonough identifies six major items of work as additional causes of "excusable" delay, including: security windows; chiller equipment; kitchen equipment; hollow-metal frames; electronic security and wiring; and expansion joints. Mr. McDonough testified that Morganti is entitled to excusable delay for each of these items. For the reasons that follow, the court finds that none of these issues caused delay to the critical path of the project, such that the September 22, 1997 substantial completion date should be extended.

First, with respect to security windows, Mr. McDonough testified that because Morganti decided to install temporary window coverings sometime in late 1995, procurement and installation of security windows would not move onto the critical path until sometime following cell-panel installation. Mr. McDonough further testified that at the time of termination, installation of the security windows was 60 days off the critical path.[12] Because none of the delay associated with the security windows delayed ultimate completion of the project, any delays associated with security windows do not provide a reason for extending the September 22, 1997 substantial completion date.

Second, Mr. McDonough's report and testimony regarding the chillers does not support any additional delay claim. The FBOP approved Morganti's chiller manufacturer on May 24, 1995. Although Mr. McDonough claims that the testing for each chiller required by the contract specifications "was more time-consuming than originally planned," there is no specific evidence that shows that the FBOP was responsible for any specific period of delay.

Third, Mr. McDonough claims that Morganti experienced significant delays due to issues relating to design and coordination of the kitchen equipment. However, Mr. McDonough admits that these issues were re-solved in August 1996 and that Morganti still projected a completion date of September 1997. Thus, Morganti failed to demonstrate how any of the delays regarding the kitchen equipment caused critical path delay.

Fourth, Morganti's delay claim regarding FBOP-caused delay relating to the hollow-metal-frame design does not withstand scrutiny. The FBOP granted a time extension for this delay in Mod 331. Although Mr. McDonough claims additional delays during 1996 and 1997, the evidence adduced at trial established that cell-panel procurement and then installation and MEP work were on the critical path, not hollow-metal frames. No evidence was presented to show that these alleged delays caused delay to the overall completion date.

Fifth, with respect to Morganti's claims relating to electrical and security wiring, there was no evidence presented that Morganti ever made enough progress with security wiring for any of these alleged delays to have resulted in any critical path delay. The evidence established that throughout 1997 until termination cell-panel installation and MEP work were still on the critical path.

Finally, with respect to any delay attendant to the FBOP's expansion joint design, it appears these issues were resolved through a series of RFI's exchanged in August 1995 and Modification 275, issued on April 5, 1996. Although Mr. McDonough asserts that there were additional RFI's regarding the expansion joint design in January 1997, Mr. McDonough failed to present any evidence to show that these RFI's affected the critical-path work relating to cell-panel and MEP installation. The court therefore finds that the expansion joint design problems do not provide grounds for any extension of time beyond September 22, 1997.

In sum, because Morganti failed to establish that any of these alleged delays resulted in a delay to the critical path of the project,

---

12. In fact, Morganti did not install any security windows prior to termination. The first delivery of security windows arrived on January 24, 1997. However, these windows could not be installed due to defects in their construction, and therefore Morganti returned them to the manufacturer. Subsequently, on February 27, 1997, the FBOP issued a suspension of work on the windows, preventing Morganti from installing any windows until the defects were repaired. The suspension of work was not lifted prior to Morganti's termination.

Morganti is not entitled to any additional time for these issues.

### 6. Morganti's Ability to Complete the Work Within the Contract as Extended

The undisputed evidence demonstrated that at the time of termination Morganti would have required approximately another year—or six months beyond the September 22, 1997 substantial completion date—to complete the project. Because Morganti was not entitled to any time extension beyond September 3, 1997, the contracting officer's decision to terminate Morganti for default based on a September 22, 1997 substantial completion date was reasonable.

### C. Liquidated Damages

 Morganti seeks the return of the $840,000 in liquidated damages that the FBOP assessed and withheld from progress payments, plus interest. "As a general rule, a party asserting that liquidated damages were improperly assessed bears the burden of showing the extent of the excusable delay to which it is entitled." *Sauer Inc.*, 224 F.3d at 1347 (citations omitted); *Youngdale & Sons Constr. Co., Inc. v. United States*, 27 Fed.Cl. 516, 564 (1993) (citation omitted). Because the court concludes that Morganti was entitled to a time extension based on excusable delay extending the contract to September 3, 1997, the FBOP's imposition of liquidated damages beginning on January 1, 1997, on the grounds that December 31, 1996 was the official contract completion date, was improper. *Youngdale & Sons*, 27 Fed.Cl. at 564–65 (citations omitted). Accordingly, Morganti is entitled to a return of the $840,000 withheld from progress payments as liquidated damages. However, return of these liquidated damages, together with any appropriate interest, is presently premature. The court finds that final resolution of Morganti's entitlement to liquidated damages should await resolution of all of Morganti's payment claims.

### D. Morganti's Breach of Contract Claims

 The court now turns to Morganti's breach of contract claims. A contractor's failure to perform may be excused and a termination for default converted to a termination for the convenience of the government if the contractor can establish that the government materially breached the contract. *Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1276 (Fed.Cir.1999); *Malone v. United States*, 849 F.2d 1441, 1445 (Fed. Cir.1988). Not every departure from the literal terms of a contract is sufficient to be "material." *Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548, 1550 (Fed.Cir. 1992); *Consumers Oil Co.*, ASBCA No. 24172, 86–1 BCA ¶ 18,647, at 93,713, 1985 WL 17314 (1985) (holding only a "material" breach discharges contractor's duty to perform). The Federal Circuit has held that whether a particular breach is material "depends on the nature and effect of the violation in light of how the particular contract was viewed, bargained for, entered into, and performed by the parties." *Stone Forest*, 973 F.2d at 1551 (citing RESTATEMENT (SECOND) OF CONTRACTS § 241 cmts. a & b (1981)).

Morganti argues that the FBOP's conduct in administering the contract amounted to a material breach, such that Morganti's failure to perform should be excused and the termination for default should be converted to one for the convenience of the government. At trial, the court heard extensive testimony regarding the FBOP's administration of Morganti's contract. Through its witnesses, Morganti sought to establish that the FBOP had materially breached the contract by: (1) making late progress payments; (2) making baseless retainages and excessive withholdings; (3) failing to negotiate and make payment of CPC's and unilateral modifications; and (4) failing to maintain sufficient project funding. The court will examine each of these claims in turn.

### 1. Late Progress Payments

Morganti's first breach of contract claim relates to the FBOP's delayed payment of progress payments. The prompt payment clause included in the contract, F.A.R. 52.237–27, required that the FBOP make payment to Morganti within 14 days of receiving a requisition. The FBOP concedes

that it paid all but one of the progress payments made during the contract beyond the 14 days required under the contract.[13] Ms. McBride testified that at the time she was administering the contract, she believed the contract included a different payment clause under the F.A.R., which provided that payments were due within 30 days of requisition. The FBOP does not now dispute that it was required to remit properly-requisitioned payment requests within 14 days.

 Although the FBOP admittedly violated the contract with regard to the timeliness of progress payments, the court concludes that it did not materially breach the contract. "[F]ailure to pay progress payments when due is not a material breach per se. Materiality must be shown by the totality of the facts and circumstances." *D.W. Sandau Dredging*, ENGBCA No. 5812, 96–1 BCA ¶ 28,064, at 140,161, 1995 WL 739023 (1995). In this connection, "the amount of money involved, the length of time of the non-payment, and the payment procedure agreed to by the parties are significant factors to consider" in determining whether a breach due to non-payment is material. *Jones Plumbing & Heating, Inc.*, VABCA Nos. 1845, 1869, 86–1 BCA ¶ 18,659, at 93,-857, 1985 WL 17668 (1985) (quoting *General Dynamics Corp.*, DOTCAB No. 1232, 83–1 BCA ¶ 16,386, 1983 WL 7499 (1983)).

 Where, as here, the contract contains a specific remedy-granting clause that pertains to progress payment disputes, that clause governs. Pursuant to the prompt payment clause, F.A.R. 52.232–27, Morganti is entitled to interest for late payments, which would remedy any damages sustained as a result of FBOP's late payments. In such circumstances, the contract clause mitigates the materiality of the breach. *D.W. Sandau Dredging*, 96–1 BCA ¶ 28,064, at 140,161, 1995 WL 739023 (holding that under the totality of the circumstances, "the lateness of the 2 undisputed payments which were made is not significant and the Prompt Payment and/or Disputes provisions of the

contract and applicable law and regulations provide an adequate remedy").

The court recognizes that a "prolonged failure to pay large amounts" could constitute a material breach. *Northern Helex Co. v. United States*, 197 Ct.Cl. 118, 125, 455 F.2d 546, 550 (1972). However, here, the evidence established that the FBOP never refused to pay Morganti; the FBOP merely delayed payment. While the FBOP's payment history was not perfect, it is not disputed that Morganti received $82 million in progress payments on a $110 million project that it ultimately failed to complete. In such circumstances, the FBOP's conduct does not constitute a material breach. *Id.* at 124, 455 F.2d 546 (holding that "mere delay in payment, for a while, would not be a material breach"); *Jones Plumbing & Heating, Inc.*, 86–1 BCA ¶ 18,659, at 93,857, 1985 WL 17668.

In concluding that the FBOP's failure to make progress payments within 14 days does not amount to a material breach, the court also finds it significant that Morganti apparently acquiesced to the FBOP's 30–day payment period. Morganti presented the testimony of Patrick Menefee, a contract administrator for Morganti, who stated that he told Ms. McBride in 1994 that she was using the wrong payment period. Mr. Menefee testified that he told Ms. McBride that he believed the contractual payment period was 14 days, but that she advised him that the contract provided a 30–day payment period. Ms. McBride testified that her recollection was that Morganti had complained about the FBOP's rejecting certain payment requisitions, and retaining and withholding money from progress payments, but that Morganti had not complained about the 30–day payment period that the FBOP was using. In any event, Morganti did not present any evidence to suggest that it pursued the matter further with the FBOP. To the contrary, Morganti did not raise the issue again until April 1997, just before the termination. In such circumstances, Morganti failed to prove its contention that the late payments consti-

---

**13.** The court notes that the delay associated with the final progress payment occurred after the termination for default, and therefore it is not relevant to determining whether the FBOP materially breached the contract prior to the termination.

tuted a material breach that would have justified Morganti's nonperformance. *D.W. Sandau Dredging*, 96–1 BCA ¶ 28,064, at 140,161, 1995 WL 739023 (holding that "contractor complaints that late or no payments are affecting performance" is a significant factor in determining materiality); *Jones Plumbing & Heating, Inc.*, 86–1 BCA ¶ 18,659, at 93,858, 1985 WL 17668 (finding breach was not material where contractor did not pursue payment or assert any urgency).

## 2. Retainages and Withholdings

### a. Retainages for Lack of Progress

The court also finds that the FBOP's practice of retaining money from progress payments did not amount to a material breach. The parties agree that beginning in May 1995, the FBOP began to retain portions of Morganti's progress payments under F.A.R. 52.232–5(e), based on Morganti's failure to make progress. Under F.A.R. 52.232–5(e), the contracting officer "may retain a maximum of 10 percent of the amount of the [progress] payment until satisfactory progress is achieved." *Nexus Constr. Co.*, ASBCA No. 31070, 91–3 BCA ¶ 24,303, at 121,461, 1991 WL 179322 (1991) (recognizing that the government "may suspend or withhold progress payments under certain circumstances depending on the contract's provisions"). The evidence presented at trial established that the total amount that the FBOP held as retainage peaked at approximately $4 million. However, at various times, the FBOP released portions of this money to Morganti as Morganti achieved adequate progress. At the time of termination, the FBOP was holding less than $1 million in retainages and withholdings (excluding liquidated damages).

 Morganti contends that the FBOP's retainage was excessive because the FBOP retained money from progress payments without regard to FBOP-caused delay. It is well established that the government possesses broad discretion with regard to retainage and its actions in this regard are to be evaluated under an abuse of discretion standard. *Technocratica*, ASBCA Nos. 44347, et al., 94–1 BCA ¶ 26,584, at 132,288,

1993 WL 557156 (1993); JOHN CIBINIC, JR. & RALPH C. NASH, JR., ADMINISTRATION OF GOVERNMENT CONTRACTS, 1171 (3d ed.1995). Here, the court finds that the FBOP did not breach the contract by retaining money from progress payments. While there was delay on the part of both Morganti and the FBOP in submitting and evaluating TIA's in support of time extension requests, Morganti presented no evidence to show that the FBOP's delay in analyzing such requests was the result of an abuse of discretion or bad faith on the part of the FBOP. Ms. McBride's testimony established that she exercised her discretion with regard to retainage in a reasonable manner and that Morganti did not seriously challenge her decisions at the time. Moreover, once the contract schedule was extended through a bilateral modification, the FBOP released to Morganti any retainage relating to the time period covered by the extension.

### b. Withholdings for Deficient Work

With respect to the FBOP's withholding for deficient work, the court also concludes that Morganti failed to prove a material breach. Under the terms of the contract, in addition to its right to retain money for lack of progress, the FBOP was entitled to withhold money for deficiencies in work from progress payments. F.A.R. 52.232–5(b). The FBOP admits that throughout the course of the project, it withheld portions of the progress payments due Morganti for alleged deficiencies in Morganti's work that it had identified in D & O's.

In particular, Morganti challenges the FBOP's withholding for concrete deficiencies. Morganti relied on the testimony of Ms. McBride and Mr. Menefee to establish that the FBOP withheld the entire Progress Payment 17 without first obtaining a cost estimate for the repairs. In addition, Morganti presented Mr. Menefee and a financial expert, Jeffrey Fuchs, who testified that the FBOP withheld cumulative amounts for the same concrete deficiencies.

Ms. McBride admitted that she withheld $3.2 million from Progress Payment 17, dat-

ed June 23, 1995, for deficient concrete work without knowing the actual amount needed to repair the deficient work. Ms. McBride explained that this money was released on July 14, 1995, however, in interim Progress Payment 18A, after a meeting between the FBOP and Morganti, and pending the parties' agreement regarding a concrete repair plan detailing the actual repairs required. Subsequently, Morganti consented to a concrete repair plan that included an itemized valuation of the required concrete repairs and a schedule by which Morganti would perform those repairs. The FBOP then withheld $1.9 million from Progress Payment 18, dated July 21, 1995, for the concrete deficiencies described in the concrete repair plan.

The court assumes that government officials act in good faith and requires a specific showing of intent to injure the contractor in order to establish bad faith on the part of the government. *Caldwell & Santmyer, Inc. v. Glickman*, 55 F.3d 1578, 1581 (Fed.Cir.1995) (citations omitted). The court finds, based on the evidence presented regarding Progress Payments 17, 18A, and 18, that while the FBOP may have initially acted too quickly in withholding money for concrete repairs, Ms. McBride did not intend to harm Morganti and thus her actions do not amount to a material breach. While Ms. McBride's conduct in withholding the entire amount due in Progress Payment 17 without sufficient information about the cost of the repairs may have been excessive, Ms. McBride did not act in bad faith. Ms. McBride testified that she withheld the entire Progress Payment 17 because there was so much deficient concrete work that neither the FBOP nor Morganti could really determine the cost of each repair until a repair plan was submitted.

Moreover, the FBOP released the money it had improperly withheld from Progress Payment 17 after a period of only 20 days. The subsequent withholding for deficient concrete in Progress Payment 18 was made in accordance with the concrete plan to which Morganti had agreed. The fact that Ms. McBride worked with Morganti to resolve these issues regarding deficient work demon-strates that she was operating in good faith. The fact that Morganti agreed that the repairs were necessary and agreed to the amounts in the concrete repair plan also supports the court's conclusion that Ms. McBride was not acting in bad faith.

Further, Morganti failed to present any evidence to demonstrate that the FBOP's additional withholdings were improper or excessive. Although Mr. Fuchs testified that the FBOP withheld a total of $6.7 million for defective work throughout the project, this amount clearly fluctuated depending on the quality of the work performed and the speed at which Morganti corrected deficient work. Morganti did not show that the work for which the various withholdings were made was not deficient. Moreover, the money withheld for deficient concrete work, as well as money withheld for other deficiencies in Morganti's work, was released to Morganti as the defective work was corrected.

Morganti's additional complaint, that the FBOP "double-" and "triple-dipped" by first withholding money for concrete repairs, and then retaining money for lack of progress on those repairs, also fails to give rise to a material breach claim that would excuse Morganti's failure to perform. The FBOP was merely exercising separate rights under the contract. When viewed in light of the totality of the circumstances, the FBOP's conduct with regard to withholding for deficient work and retaining money for lack of progress was not in bad faith, but was within its rights under the contract. Therefore, the FBOP's actions with regard to withholding and retaining do not constitute a material breach.

3. **Negotiation and Payment of CPC's and Unilateral Modifications**

In addition to progress payments, Morganti presented testimony to show that the FBOP's conduct related to CPC's and unilateral modifications amounted to a material breach. Mr. Catino and Mr. Menefee testified that Morganti was owed approximately $30 million at the time of termination for CPC's and unilateral modifications, and that the FBOP's failure to negotiate and make

payment violated the implied duties of good faith, fair dealing, and cooperation.

 Notably, under the terms of the contract, Morganti had the burden of establishing entitlement to payment for CPC's and unilateral modifications. Morganti submitted CPC's for changes in the work, including unilateral modifications, that it believed required an equitable adjustment to the contract price. Morganti has the burden of establishing that it is entitled to an equitable adjustment under the Changes Clause of the contract. F.A.R. 52.243–4. In addition, F.A.R. 43.201(b), governing change orders, and F.A.R. 52.233–1, governing disputes, require the contractor to proceed with performance until the contractor's claims of entitlement can be resolved under the Changes Clause. "A contractor may not abandon a contract solely because it *claims* there is money due." *In re Boston Shipyard Corp.*, 886 F.2d 451, 457 n. 4 (1st Cir.1989).

 At trial, the court heard testimony from Ms. McBride, Ms. Moore, Mr. Catino and Mr. Menefee regarding the FBOP's conduct with regard to CPC 53 and CPC 58 in particular. There is no dispute that Morganti submitted CPC 53 to the FBOP on March 28, 1996, seeking $3.9 million in direct and indirect costs incurred as a result of winter weather delays associated with concrete placement in the winter of 1994–1995. Ms. McBride testified that due to more pressing issues relating to the non-compensable time extension granted in Mod 331 and the Schedule B Agreement, the negotiation of CPC 53 was delayed until late 1996. After Ms. Moore became the contracting officer in November 1996, she evaluated Morganti's claims in CPC 53, and in December 1996 she made an initial offer of $2.3 million to Morganti. In February 1997, after further evaluation and negotiation, Ms. Moore ultimately increased her offer to $2.73 million.

· Because of a condition of acceptance added by Ms. Moore during the final round of negotiations that would require Morganti to terminate a Freedom of Information Act request brought by one of Morganti's subcontractors, Morganti required additional time for attorney review of the FBOP's offer. Morganti communicated its acceptance of the FBOP's offer of $2.73 million for CPC 53 on April 29, 1997. However, on April 30, 1997, Ms. Moore terminated Morganti's contract for default and therefore CPC 53 was never definitized as a bilateral modification, nor was it paid to Morganti.

Morganti contends that this evidence proves that the FBOP delayed negotiating CPC 53 in bad faith. The court disagrees. The Federal Circuit has stated that " '[s]ubterfuges and evasions violate the obligation of good faith,' as does lack of diligence and interference with or failure to cooperate in the other party's performance." *Malone*, 849 F.2d at 1445 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. d). Here, the court finds nothing intentionally deceitful or dilatory in Ms. McBride's or Ms. Moore's conduct as they attempted to address CPC 53. Ms. McBride testified that Morganti had not complained about delays in negotiating CPC 53 at any time before she left the project in November 1996. Subsequently, in November 1996, Ms. Moore became the contracting officer and asked Morganti for a prioritized list of pending CPC's and unilateral modifications for which it sought payment. Ms. Moore took personal responsibility for resolving the highest priority CPC's and unilateral modifications, including CPC 53. In addition, between August 1996 and December 1996, the FBOP assigned two additional contracting officers to the project to assist Ms. McBride and Ms. Moore with processing CPC's and unilateral modifications. It is clear that both Morganti and the FBOP were attempting to deal with a multitude of contract administration issues at the time, and there is no evidence that Ms. Moore acted unreasonably or in bad faith with respect to the time she devoted to negotiating CPC 53.

Similarly, the court finds no merit to Morganti's contention that the FBOP unjustifiably delayed resolution of CPC 58 in order to avoid payment. Morganti submitted CPC 58 to the FBOP in May 1996, seeking $302,000 for subcontractor costs incurred as a result of the compensable delay caused by winter concrete placement that occurred in the winter of 1994–1995. On May 31, 1996, the FBOP wrote Morganti requesting a revised

CPC 58 with additional supporting documentation. Subsequently, on August 19, 1996, Morganti resubmitted CPC 58, seeking $8.1 million for subcontractor costs incurred during a compensable time extension granted for winter concrete placement in the winter of 1994–1995.

Ms. McBride testified that she did not immediately address CPC 58 as a result of the same issues that precluded her immediate review of CPC 53, namely Mod 331 and the Schedule B Agreement. However, Ms. Moore explained that she took personal responsibility for resolving CPC 58 when she became the contracting officer in November 1996, because it had been identified by Morganti as one of its top priority CPC's. Because CPC 58 sought $8.1 million, primarily in indirect costs, Ms. Moore determined that an audit was necessary. Ms. Moore began to take steps to obtain an audit of CPC 58 in early November 1996. The audit was not completed as of the April 30, 1997 termination and therefore CPC 58 was unresolved at the time of termination.

In view of these facts, the court finds that Morganti failed to establish that the FBOP unreasonably delayed resolution of CPC 58. Although Ms. McBride did not devote her immediate attention to CPC 58, it is clear from the record that the parties were both occupied by a number of other matters at the time, including negotiation of a non-compensable time extension granted in Mod 331 and the Schedule B Agreement. Indeed, the court finds Ms. McBride's willingness to negotiate the Schedule B Agreement and to forbear from terminating Morganti if it showed progress toward meeting the September 22, 1997 substantial completion date as significant evidence of the FBOP's good faith.

Moreover, the record reflects that the parties were able to definitize several CPC's and unilateral modifications during this period. During 1996 and up until Morganti's termination in April 1997, the FBOP and Morganti executed nearly 50 bilateral modifications, which definitized more than 60 unilateral modifications, 11 CPC's and 5 TIA's, which resulted in increases of $3.7 million to the contract price and added 221 calendar days

to the contract schedule. Given the fact that Morganti did not submit CPC 58 until more than a year after the events that it addressed, the court finds that Morganti did not view CPC 58 as a high priority until November 1996. The government responded accordingly. Thus, the court concludes that Morganti failed to establish that the FBOP materially breached the contract by its handling of CPC's.

4. **Maintaining Adequate Project Funding**

Morganti also claims that the evidence established that the FBOP materially breached the contract by failing to maintain sufficient project funding. Morganti claims that the FBOP failed to negotiate CPC's and unilateral modifications because it lacked adequate project funding. In particular, Morganti alleges that the FBOP deliberately delayed resolution of CPC 8B, CPC 53, and CPC 58 because the project lacked the funding to make payment on those CPC's. Ms. McBride and Ms. Moore, the contracting officers, both testified that at no time did periodic funding shortfalls in the project budget delay resolution of CPC's or unilateral modifications.

At trial, Mr. Cohen, the FBOP's project cost manager, explained how the FBOP funds specific projects. Mr. Cohen testified that the FBOP does not maintain full funding for a project in the project's budget at any given time. Rather, as money is needed, the FBOP transfers money into the specific project budget. The transfer of funds into a specific project budget is not triggered until the parties reach a meeting of the minds with regard to the amount for a particular CPC.

With respect to CPC 8B, the evidence showed that after it was negotiated in December 1995, approximately $10 million was infused into the project budget in January and February 1996. By March 1, 1996, Ms. McBride and Morganti executed Mod 260, which definitized CPC 8B for $800,220. Thus, between the time CPC 8B was negotiated and the bilateral contract modification necessary for its payment was executed, the funds were transferred into the project budget. The court finds that this two-month

period in which the money was transferred was not an unreasonable delay. Moreover, no evidence was presented that established that the FBOP intentionally delayed negotiation or payment of CPC 8B due to a lack of funding.

Similarly, the court finds that Morganti failed to establish a breach of good faith with respect to project funding for CPC 53. As discussed above, CPC 53 was negotiated in late 1996 through early 1997. However, before the parties could execute a bilateral contract modification definitizing the parties' agreement, Ms. Moore insisted that a request under the Freedom of Information Act, allegedly relevant to the dispute resolved by CPC 53, be withdrawn. Morganti explained that its attorneys had to approve this last-minute condition added by Ms. Moore. Morganti informed Ms. Moore on April 29, 1997, that it would accept the condition of payment, and Ms. Moore responded to Morganti that she would send out the necessary paperwork to definitize the corresponding bilateral contract modification. However, on April 30, 1997, the FBOP terminated Morganti for default and the CPC was never definitized.

At closing argument, counsel for Morganti argued that Ms. Moore terminated Morganti's contract for default rather than pay Morganti for CPC 53. Morganti presented no evidence to show that the FBOP intentionally terminated Morganti for default because there was a lack of funding to carry out the project. As discussed above, Ms. Moore's decision to terminate Morganti for default was based on her reasonable belief that Morganti was not progressing the work with the diligence that would ensure completion of the project by the agreed-upon substantial completion date of September 22, 1997. The evidence presented at trial demonstrated that this decision was in no way influenced by Ms. Moore's alleged perception that there was a lack of funding. Rather, Ms. Moore based her decision on her observation that Morganti had consistently achieved a slow rate of progress from the time she arrived on the project, juxtaposed against the amount of work remaining to be done at the time of termination.

Moreover, the fact that the FBOP negotiated and paid Morganti for a number of unilateral modifications and CPC's throughout 1996 belies the notion that either Ms. Moore or Ms. McBride believed there were insufficient funds to carry out the project. As noted above, during 1996 and up through the time of termination in April 1997, the FBOP and Morganti executed nearly 50 bilateral modifications, which added $3.7 million to the contract price and 221 calendar days to the contract schedule.

Finally, Morganti failed to establish that Ms. Moore's decision to request an audit of CPC 58 had anything to do with project funding. Ms. Moore explained that she requested an audit of CPC 58 in November 1996 because the indirect costs sought by Morganti's request necessitated an independent audit. In CPC 58, Morganti was seeking extended overhead costs for several subcontractors. Negotiations for CPC 58 could not begin until after the audit was complete. Therefore, the court concludes that insufficient project funding did not preclude the resolution of CPC 58, rather the CPC remained outstanding because the audit was not complete.

### 5. Cumulative Financial Impact on Morganti

 Finally, Morganti contends that when viewed cumulatively, the FBOP's actions throughout Morganti's performance of the project amounted to a material breach of its implied duties of good faith, fair dealing, and cooperation. As evidence of the materiality of the FBOP's alleged breach, Mr. Fuchs testified that Morganti self-financed $17.7 million and its subcontractors self-financed $11.7 million for completion of the project. Mr. Fuchs asserted that these amounts translate into the $30 million in unilateral modifications and CPC's sought by Morganti throughout 1996 and 1997 that remained unpaid at termination. Mr. Fuchs further explained that Morganti incurred $2 million in interest expenses in order to borrow the money necessary to finance the project as a result of these unpaid claims.

The court finds that the fact that Morganti had to borrow money to pay subcontractors

and may have incurred $2 million in interest expenses on a $110 million contract does not establish a material breach. Morganti may recover the $2 million it incurred in interest costs as an equitable adjustment if it can establish that the loans were borrowed specifically to finance changed work. *Wickham Contracting Co., Inc. v. Fischer,* 12 F.3d 1574, 1582–83 (Fed.Cir.1994); *Gevyn Constr. Corp. v. United States,* 827 F.2d 752, 754 (Fed.Cir.1987) (citations omitted).

While it is true that the FBOP's contract administration was not perfect, when viewed in its totality, Morganti failed to prove that the FBOP acted in bad faith. The evidence demonstrated that both Ms. McBride and Ms. Moore devoted significant amounts of time and resources toward resolving each of the issues raised above. As a result of their efforts, the FBOP resolved a number of CPC's and unilateral modifications in 1996 that provided Morganti with additional monetary compensation and time extensions. In addition, both Ms. McBride and Ms. Moore took steps throughout the project to assist Morganti. Ms. McBride testified that in an effort to assist Morganti with its financial difficulties, she made some partial payments to Morganti for work performed in response to unilateral modifications, even though the contract required that the amount for such work first be definitized in a bilateral modification. Ms. Moore also took steps to try to get Morganti paid for unilateral modifications prior to the execution of bilateral modifications with respect to CPC 53 and CPC 58. Ms. Moore testified that she believed Morganti was entitled to some money for these CPC's, even though she disagreed with the total amount Morganti was requesting in each of the CPC's. Thus, Ms. Moore released $2 million that was being retained for lack of progress until she and Morganti could definitize bilateral modifications based on CPC 53 and CPC 58.

In sum, the court finds that neither Ms. McBride nor Ms. Moore did anything to intentionally undermine Morganti's performance. Importantly, Morganti presented no

evidence that the FBOP's conduct interfered with its ability to perform. *D.W. Sandau Dredging,* 96–1 BCA ¶ 28,064, at 140,160, 1995 WL 739023 (holding that whether failure to make progress or other payments is material depends upon the seriousness of the breach and its impact on the contractor's ability to perform) (citing *Northern Helex,* 197 Ct.Cl. at 124–25, 455 F.2d at 550; RESTATEMENT (SECOND) OF CONTRACTS § 237). To the contrary, Morganti readily conceded that it always maintained sufficient funding for critical path work and that there was never a time when it lacked sufficient funding to proceed. Mr. Menefee, Morganti's contract administrator, testified that Morganti never allowed its difficulties with getting money for CPC's and modifications to affect critical path work, and that Morganti always provided funding necessary to pay the subcontractors. In fact, Morganti conceded on summary judgment that the FBOP's payment errors never delayed Morganti.[14] Thus, money was not the source of its inability to complete the contract work on time. *D.W. Sandau Dredging,* 96–1 BCA ¶ 28,064, at 140,161–62, 1995 WL 739023 (holding that continued performance is relevant to materiality where contractor's performance failures were not caused by financial situation).

Morganti argues that its ability to perform despite the FBOP's alleged payment failures should not be considered in a material breach analysis because that would put cash-rich contractors at the mercy of the government. This argument does not apply in cases such as the present, where the government in fact made progress payments throughout the contract. "While we do not find that serious adverse financial impact [on the contractor] must be present in all instances for establishing a material breach due to withholding money, it is an element that will be considered in arriving at the overall judgment." *Jones Plumbing & Heating, Inc.,* 86–1 BCA ¶ 18,659, at 93,858, 1985 WL 17668.

---

14. Contemporaneous with their pretrial submissions, the parties filed cross motions for partial summary judgment with respect to the interpretation of the Schedule B Agreement and the material breach issues. The court denied the parties' cross motions in a bench ruling issued on June 29, 2000.

The court's findings that the FBOP's payment errors were not intentional or substantial and that the FBOP did not act unreasonably or in bad faith in resolving CPC's and unilateral modifications, taken in combination with Morganti's admission that the alleged financial burden imposed by the FBOP did not affect its ability to perform, lead the court to conclude that Morganti failed to establish that the FBOP materially breached the contract. In such circumstances, the FBOP's actions do not provide a basis for invalidating the default termination.

## VI. CONCLUSION

For the foregoing reasons, the court finds that the FBOP's termination for default of Morganti's contract must be upheld. Accordingly, the court directs the Clerk of the Court to enter judgment in favor of the defendant consistent with this opinion. No costs.